UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH CAROLINA
FLORENCE DIVISION

| | | |
|---|---|---|
| GREGORY D. BETHEA, WILLIAM OLIVER, AVERY JETT, DARRYL E. BROWN and EARNEST McWHITE, | ) ) ) | Civil Action No.: 4:11-cv-1569-RBH-TER |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| -vs- | ) | **REPORT AND RECOMMENDATION** |
| | ) | |
| | ) | |
| CSX TRANSPORTATION, | ) | |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

## I.    INTRODUCTION

This employment case arises out of Plaintiffs'[1] employment with Defendant CSX Transportation (CSXT or Defendant).  Plaintiffs allege they were subjected to a hostile work environment and retaliation in violation of Title VII of the Civil Rights Act of 1964 (Title VII), 42 U.S.C. § 2000(e) et seq. and 42 U.S.C. § 1981.  Presently before the Court is Defendant's Motion for Summary Judgment as to Plaintiff Darryl Brown's claims (Document # 85).  All pretrial proceedings in this case were referred to the undersigned pursuant to the provisions of 28 U.S.C. § 636(b)(1)(A) and (B) and Local Rule 73.02(B)(2)(g), DSC.  Because this is a dispositive motion, this Report and Recommendation is entered for review by the district judge.

## II.    FACTS

### A.    CSXT

CSXT is a railroad transportation company operating in the Eastern United States and

_____

[1]Plaintiffs Bethea, Oliver and Jett have been dismissed from this action.  The only Plaintiffs remaining are Brown and McWhite.

headquartered in Jacksonville, Florida.  Nihoul Decl. ¶ 2.  CSXT employs approximately 31,000 workers, most of whom are unionized and governed by collective bargaining agreements and the federal Railway Labor Act ("RLA").  Nihoul Decl. ¶ 3.

CSXT is divided organizationally into departments and geographically into regions and divisions.  Nihoul Decl. ¶ 4.  The Florence Division is based in Florence, South Carolina and runs along the east coast from Richmond, Virginia to Augusta, Georgia.  Bethea Dep. 65-66; see also Phipps Dep. 57-58. One of the CSXT organizations is the Engineering Department.  Nihoul Decl. ¶ 4.  Maintenance of Way (MOW) is a subset of the Engineering Department that is responsible for repair and maintenance of CSXT's railroad track.  Bethea Dep. 105-06.  The Florence MOW is headed by a Division Engineer.  Nihoul Decl. ¶ 5.  Each Division Engineer supervises several Engineers of Track, to whom Roadmasters and Assistant Roadmasters report. CSXT_BET001227-1228; see also Phipps Dep. 56.

**B.    CSXT's Anti-Discrimination Policies**

CSXT maintains policies that strictly prohibit all forms of discrimination and retaliation. Willis Dep.  29-33 & Exs. 13, 14.  CSXT disseminates these policies widely to employees, and reinforces them with comprehensive training programs, postings throughout work sites, and postings on the CSXT Employee Services Intranet Homepage.  West Decl. ¶ 2.  CSXT policy prohibits discrimination, including harassment based on race, color, religion, sex, age, national origin, disability, and any other basis protected by federal or state law. Brown Dep. Exs. 6-9. CSXT policy also prohibits retaliation against any individual who brings a complaint of harassment or discrimination or who participates in the investigation of such a complaint.  Id.  Brown was aware of, and participated in training on, CSXT's policy regarding equal employment opportunity,

discrimination, harassment, and retaliation.  Brown Dep. 166-67.  As a manager, Brown was also responsible for implementing these same policies.  Brown Dep. 163-66.

In conjunction with these policies, CSXT maintains an Ethics Hotline that is available to all employees who wish to report violations of the EEO, discrimination, harassment, and retaliation policies, or any other issues or complaints.  Willis Dep. 23 and Ex. 14.  CSXT policy expressly states that if an employee feels he or she has encountered harassment or discrimination in the workplace, that individual should "immediately report the incident to your Human Resources Representative, or the CSX Ethics Information Toll Free Hotline at 1-800-737-1663."  Willis Dep. 23 and Ex. 14.  The number for the Ethics Hotline is also posted in common areas at CSXT, and on the policy page of CSXT's electronic employee "Gateway."  Moore Dep. 68-71; Willis Dep. 22-24.  Brown was aware of the Ethics Hotline's existence.  Brown Dep. 139, 146-47.

### C.    Brown's Employment with CSXT

Brown was hired by CSXT in approximately July 2009 as a Management Trainee.  Brown Dep. 182-83.  Brown had no prior experience with railroads when he was hired, and had just retired from twenty years of service in the Air Force.  Brown Dep. 99-102, 118.  In February of 2010, Division Engineer Bobby Moore recommended Brown for an Assistant Roadmaster1 position.  Brown Dep. 171.  Brown's selection took effect in April of 2010.  Id.

### D.    Brown's Allegations of Offensive Conduct

#### 1.    Brad Clayton

Brown makes a number of allegations against Brad Clayton, a Roadmaster in Charleston, South Carolina, with whom Brown worked as an Assistant Roadmaster for less than a month in 2010.  Brown Dep. 67-93.  In April of 2010, Brown claims he overheard Clayton state during a

phone conversation about assigning Brown to do manual labor that "they want me to mentor and train him [Brown], but he's going to get blackered today." Brown Dep. 69-70. Brown did not make any internal complaint about this comment and does not recall anything else about this conversation, other than that Clayton's tone was "agitated." Brown Dep. 71-73. Brown claims that on another occasion, Clayton commented to Brown that Clayton "[doesn't] listen to that music you people listen to." Brown Dep. 69-74. Clayton made this comment "out of the blue," and there was no particular music playing at the time. Brown Dep. 69. Nor did Clayton indicate the type of music he was referencing. Brown Dep. 74. Clayton seemed agitated at the time he made this comment as well, and Brown was the "closest target" to Clayton. Id. Brown never complained to anyone at CSXT about this incident, either. Brown Dep. 75.

Brown complains that CSXT, through Clayton, unfairly required him to submit a medical form, known as an MD3, regarding his fitness for duty. Brown Dep. 78-84, 94. Initially, Engineer of Track John Turner, Brown's immediate supervisor, asked Brown, who had been taking Fridays off regularly, to provide an explanation for the regular absences. Brown Dep. 81. Brown told Turner that he needed Fridays off because he was "going to take medication," but declined to provide further details. Brown Dep. 82. At the request of Bobby Moore, Clayton subsequently asked Brown to have his physician complete the MD3 form substantiating his ability to work safely under the effect of whatever medication it was that Brown was taking, and told Brown not to come back to work until he did so. Brown Dep. 79. It is undisputed that Brown operated heavy equipment (including company vehicles) at the time. Brown Dep. 82-84. Brown was placed on paid leave during his absence from work pending the resolution of this issue. Brown Dep. 85-86.

Brown further alleges that Clayton once asked him to put out railroad signs in a crime-ridden

area of Charleston.  Brown Dep. 75-76.  Clayton did not use any racial language, but simply told Brown not to stop the task until it was completed.  Id.  Finally, Brown claims that in April or July of 2011, Clayton recommended that Brown pull extra weekend duty shifts over a one- to two-and-a-half month period.  Brown Dep. 87-88.  All Roadmasters and Assistant Roadmasters are responsible for taking on weekend duty shifts, but Brown claims that he was given more shifts than others.  Brown Dep. 92-93.  Brown admits he does not know whether or how often the other Assistant Roadmasters worked weekend duty shifts.  Id.  Brown did not complain to anyone at CSXT about having to work weekend duty during this brief period of time.  Brown Dep. 93.

>           2.    **John Turner**

Brown makes a handful of accusations against Engineer of Track John Turner.  Brown claims that on the occasions that he would see Turner, Turner did not offer him a greeting or shake his hand. Brown Dep. 142-43.  Turner, whom Brown felt really "didn't like him," Brown Dep. 129-30, was in charge of evaluating Brown's performance as Assistant Roadmaster.  Turner Dep. 59.  Brown alleges that Turner gave unfairly negative comments on his performance reviews.  Brown Dep. 122-23.  Turner's negative comments pertained to Brown's lack of knowledge of the track.  Id. Brown admits that he lacked previous railroad experience and that he needed to learn the entire track when he was hired as a Management Trainee at CSXT.  Brown Dep. 118.  Brown further admits that track familiarity is a key aspect of being a good manager.  Id.; Turner Dep. 79 ("That is part of [the] assistant roadmaster [job], to know the territory[.]").  Brown's admissions are consistent with Turner's evaluations, which conveyed that Brown needed to learn the track and further develop his technical knowledge.  Brown Dep. 122-23; Turner Dep. 59-60 (explaining that Brown "did not seem to know the basics of what's going on pertaining to questions related to track issues, or what's going

on, who did what, or was it done right, or that type of issues."). Turner gave similar feedback to white employees regarding their need to learn the track. Turner Dep. 79 (Turner told Michelle McLaughlin, a white Assistant Roadmaster, that she "needs to be in the field, learning the track" as part of her performance evaluation.).

Brown also complains that Turner did not provide him with quality mentors, and did not follow up to ensure that he received all the on-the-job training he needed. Brown Dep. 123. Brown admits, however, that he received plenty of track time, which was designed to rectify the primary criticism of his performance. Brown Dep. 126. Brown further admits that Turner sent him to work with and learn from a number of different Roadmasters, including David Poston, Brad Clayton, and Chad Beverly. Brown Dep. 120-21. Turner's evaluations of Brown's performance indicated that Turner believed Brown possessed sufficient management expertise already, but was deficient in technical track knowledge. Brown Dep. 122-24.

Once when discussing real estate with Brown, Turner said to Brown, "you folks can't afford that." Brown Dep. 132. Brown further claims that Turner called him names such as "bo," "stupid," and "you folks." Brown Dep. 131-33. Brown believes that "bo" was short for "boy," but does not allege that Turner ever used the word "boy":

> Q: You said before that you felt that bo was short for boy, why do -- what makes you think that?
> A: My name's not Bo. It's -- all the training I've received, you don't call --you don't use bo. You don't refer to anyone as bo, unless that's their name. It's known to be short for boy.

Brown Dep. 137-38. Brown never complained to anyone about Turner calling him "bo." Brown Dep. 139. Turner, who retired from CSXT at the end of 2011, states that he calls many employees - both white and black - "bo" because he frequently has difficulty remembering names. Turner Dep.

29, 105.

### 3.     Chad Beverly

The focal point of Brown's harassment claim is Chad Beverly, a Roadmaster with whom Brown has not worked in several years.  Brown Dep. 47-48.  Brown cannot recall the last conversation he had with Beverly, which would have been a "long time ago."  Id.  Brown worked with Beverly for approximately nine months, averaging two  weeks per month.  Brown Decl. ¶ 15.

As a Roadmaster, Beverly oversees the maintenance and inspection of track in his territory. Moore Decl. ¶ 5.  Beverly's territory is centered around Florence, South Carolina.  Beverly Dep. 71; Brown Dep. 28, 31.  Roadmasters cannot hire, fire, promote, demote, or issue discipline, nor do they evaluate employee performance for purposes of performance reviews or employee evaluations. Moore Dep. 127-28 (Roadmasters have no authority to accept bids or award jobs to employees); Beverly Dep. 64-65; Beverly Dep. Conf. 140 (Roadmasters are not responsible for the hiring or firing of employees, do not decide disciplinary actions for employees, cannot promote or demote employees, and do not evaluate the job performance of employees); see also Brown Dep. 183-84 (to Brown's knowledge, Beverly has never fired or promoted anyone, and was not involved in Brown's promotion to Assistant Roadmaster).

Brown alleges the several harassing actions by Beverly.  When Brown first began working with Beverly, Beverly said to Turner, he's one of those "straight off the boat from Africa blacks," to which Turner snickered in response.  Brown Dep. 131.  The first time Brown worked on the track, Beverly made a bet with other employees, including Plaintiff Ernest McWhite—who is also black—regarding how quickly Brown would be able to get a track inspection vehicle onto the track. Brown Dep. 127-28; Beverly Dep. 187-90.  Beverly asked the dispatchers to "mess with" Brown.

-7-

Brown Dep. 127-28. McWhite was ordered by Beverly to "fuck with [Brown] to be sure that he fails." Beverly also told McWhite that Brown looked like "a lazy nigger" and asked him "who did he think he was.'" McWhite EEOC Affidavit (Ex. B to McWhite Response).

Beverly referred to Brown as a "DAN" (which Brown believes stood for "dumb ass nigger"), "SAN" (which Brown believes stood for "stupid ass nigger"), and "LAN" (which Brown believes stood for "lazy ass nigger"). Brown Dep. 134-36. The "SAN railer" (a name apparently having to do with Brown's efforts to get track time on the rails) term caught on with other employees to the point that Brown was being called and labeled the SAN railer, even at official briefings. Id. Brown asserts he complained to Turner about Beverly's use of these alleged "code" words on three occasions, and that Turner said he would talk to Beverly. Brown Dep. 141-45.

Beverly also called Brown, in Turner's presence, a "lazy ass African." EEOC Affidavit (Ex. 3 to Brown Response). Beverly called Brown "black as tar," while speaking to Turner within earshot of Brown. Id. He called Brown a "lazy nigger" and "damn monkey" in front of Turner and McWhite. He also called Brown a "CSX slave." Id.

Beverly sent Brown to Georgetown, South Carolina, a place which Beverly allegedly described as "ghetto", and told Brown that he would be fine down there around "those folks." Brown Dep. 207-09. He also sent Brown on pointless tasks to waste his time. Second Supplemental Interrogatory Responses at 4-5 (Ex. 2 to Brown Response).

Beverly tried to undermine Brown in front of union employees by changing the instructions Brown had given them. Brown Dep. 209-11. Beverly would also whisper or otherwise attempt to distract from Brown's presentations. Second Supplemental Interrogatory Responses at 4-5.

Brown also witnessed Beverly threatening and racially harassing Plaintiff McWhite.[2] Brown heard Beverly tell McWhite that McWhite was "his bitch" and if he "told him to piss sitting down that he had better do so because John West (the White Vice President of Engineering), Bobby Moore (the White Director of Engineering), and John Turner (the White Engineer of Track) were his friends." Brown EEOC Affidavit. These comments to McWhite made Brown feel threatened, too. Id. Brown worked around Beverly an average of two weeks per months during the time Brown was assigned to Florence. The harassment from Beverly was nearly constant during those times. Brown Decl.(Ex. 1 to Brown Response).

### 4.    Reports of Harassing Conduct

Brown complained to Turner about the racial slurs he was called by Beverly on at least three occasions, in approximately September and November 2010, then again in approximately March 2011. Brown Dep. 143-45. Brown reported that Beverly was calling him "SAN," "LAN," and "DAN" and detailed for what these acronyms stood, but Brown felt his complaints "fell on deaf ears." Brown Dep. 135-36, 139-140. The first time Brown complained, Turner said, "That's just Chad." Brown Dep. 140-41. Turner did not put a stop to it. Brown Dep. 139-40. Brown complained again, approximately two months later, saying that Beverly was "still doing the same things. He's calling me a lazy ass nigger, but he's using code words. He's saying LAN, you know. Can you do something about it?" Brown Dep. 142. Turner said "that would be Chad. I'll talk to him." Brown Dep. 142. Turner did not report Brown's complaints of racial harassment nor did he put a stop to the harassment. Brown Dep. 143, 216-17. Beverly's behavior did not change. Id.

---

[2]Brown also points to other racial comments by Beverly to McWhite. Brown Response p. 4. However, the record does not indicate that Brown heard these comments himself.

Brown never took his complaints higher than Turner or filed an ethics complaint because he was "deathly afraid of losing [his] job." Brown Dep. 139, 173. Turner held Brown's career in his hands. Brown Dep. 139. Michele McLaughlin testified that people are afraid for their jobs and are afraid to tell the company the truth about what's going on. McLaughlin Dep. 22-23. She confirmed that "Chad makes it really clear Mr. Moore is in his pocket." McWhite EX H, PX 8D at 00863.

On August 12, 2011, Plaintiff Ernest McWhite called the Company's Ethics Hotline and complained that Beverly engaged in unprofessional conduct towards various white and black employees - identifying Brown as someone likely to have relevant information regarding Beverly's alleged conduct. Willis Dep. 121. Shauna Watson, Manager of EEO, interviewed Brown as part of CSXT's investigation into McWhite's complaint. Brown Dep. 147-51; Brown Ex. 3. During his interview with Watson, Brown stated that he did not think Beverly was a racist[3], and that his "big beef" with Beverly was that he felt Beverly was "unprofessional." Brown Dep. 150.

Brown later testified he did not feel he could be truthful to the Ethics Committee investigator investigating McWhite's complaints. At the time he was called by the investigator on the phone, he was on the job site surrounded by his workers. Brown Dep. 147. He was afraid that whatever he said would be heard. Id. He was standing next to an individual he believed was vying for his job and therefore did not feel he could speak freely or give a full answer. Brown Dep. 147-48, 151-52. He was under duress. Id. at 151.

---

[3]In deposition, Brown claimed he made these statements under "duress" because, under his "level of paranoia", he felt as though other employees (none of whom were closer than ten feet away) could hear his interview answers. Brown Dep. 151-53. Brown did not ask to call the interviewer back from a more private place, nor did he attempt to walk farther away from other employees. Brown Dep. 147-53.

Although many of McWhite's allegations were uncorroborated at the conclusion of the investigation, the investigation did reveal that Beverly had "used inappropriate language in conversations with various employees (including white employees), including quoting certain offensive words and phrases used in a popular comedian's comedy routine," and "regularly engaged in 'joking' behavior including duct-taping [a white] employee to a chair, and sending a personal text message from another [white] employee's cell phone to make it appear that it had come from the employee." Willis Dep. Ex. 8. As a result of this unprofessional conduct, Beverly was disciplined, including receiving a final warning letter, Willis Dep. Ex. 8, and losing his entire bonus for the year, which was "several thousand" dollars. Beverly Dep. 16-19.[4]

### C.    Brown's Allegations of Retaliatory Conduct

After Brown's complaints to Turner about Beverly, Brown felt Turner treated him with even more hostility. Brown Decl. Brown felt Turner showed "dislike, disdain" for him on every occasion, "whether it be on a job site, where [he was] in charge, he would take those occasions to undermine [Brown's] position, my qualifications, my proficiency . . . ." Brown Dep. 114-15. Turner frequently told him to "shut up" and "would take every opportunity to degrade [him], essentially make fun of [him]." Id. He was always "negative and condescending." Id. at 130.

Brown asserts Turner refused to give Brown effective mentors, despite the incredible efforts Brown was making to learn and perform the duties of his job. He was eager to learn. Brown Dep. at 119. He asserts that he worked with David Poston, who was an effective mentor in some respects, but, Brown asserts, it was apparent that Poston was receiving orders from Turner to send Brown

---

[4]In his deposition, Beverly testified that his bonus for the prior year was between $10,000 and $20,000. Beverly Dep. Conf. 17-18.

hours away to work with the "extra gangs," – union employees, predominantly Black – instead of learning more about his management role, unlike his White peers. Brown Dep. 121-22. He asserts that he was often assigned to run the Sperry Car – typically a job for a Track Inspector. Brown Decl. Plaintiff asserts that Turner's failure to provide him with adequate mentors and management training resulted in Turner giving him a negative performance review in 2011, which in turn resulted in Brown receiving a bonus that was several thousand dollars less than it should have been. Brown Decl.

Brown also asserts that Turner retaliated against him by repeatedly transferring him to undesirable locations to work under undesirable mentors, who continued to harass him. Within a couple of weeks after lodging his third complaint against Beverly to Turner in approximately March 2011, Turner transferred Brown to Apex, North Carolina and then, a few weeks later, to Laurens, South Carolina. Brown Decl. Apex and Laurens were over four and three hours, respectively, from his home in Charleston, rendering it difficult to see his family on a regular basis, and limiting the time he had with them. Apex was a failing station with many problems, and Brown felt he was sent there to fail. Instead he worked for weeks without a day off in order to make it work. Id. Laurens, too, was a problematic station with a problematic team that had been reportedly falsifying hours. Turner refused to assist Brown in his efforts to turn this team around, and refused, even to respond to his emails. Id.

Brown argues that Turner further retaliated against him after he filed his Charge of Discrimination with the EEOC in September of 2011. Brown EEOC Charge (Ex. 3 to Brown Response). In October 2011, Turner again transferred Brown, this time to Charlotte, NC, several hours from his home in Charleston, where he worked until his termination in February of 2013.

Brown Dep. 198-99; Brown Decl.  Prior to Brown's official transfer to Charlotte, Brown had worked

with Sam Pimental, the Charlotte Roadmaster, on occasion. In September 2011, Pimental verbally

attacked Brown, telling him that something must be "inherently wrong" with him. Email Dated Sept.

8, 2011 (Doc. 91-1 at 289).  Brown complained about this attack, in writing, to Pimental, Bill

McDaniel, and Turner. Id.  Turner then transferred Brown to work under Pimental on a permanent

basis.  Brown Decl.

     Brown asserts that while working in Charlotte, he was constantly given risk-laden

assignments with very little manpower or support, and insufficient guidance and communication.

He was forced to work unusually long hours – late on Fridays (his travel-home day) and many

weekends. Brown Decl.  In addition, since working in Charlotte, the locks on Brown's CSXT vehicle

have been broken and he found a Nazi lightning bolt symbol painted on a desk in the briefing room

in Charlotte. Brown Dep. 201-204. His car was also egged in February 2012. Brown Dep. 206.

## III.    STANDARD OF REVIEW

     The moving party bears the burden of showing that summary judgment is proper.  Summary

judgment is proper if there is no genuine dispute of material fact and the moving party is entitled to

judgment as a matter of law.  Fed.R.Civ.P. 56(a); Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).

Summary judgment is proper if the non-moving party fails to establish an essential element of any

cause of action upon which the non-moving party has the burden of proof.  Celotex, 477 U.S. 317.

Once the moving party has brought into question whether there is a genuine dispute for trial on a

material element of the non-moving party's claims, the non-moving party bears the burden of coming

forward with specific facts which show a genuine dispute for trial.  Fed.R.Civ.P. 56(e); Matsushita

Electrical Industrial Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574 (1986).  The non-moving party

must come forward with enough evidence, beyond a mere scintilla, upon which the fact finder could reasonably find for it. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986). The facts and inferences to be drawn therefrom must be viewed in the light most favorable to the non-moving party. Shealy v. Winston, 929 F.2d 1009, 1011 (4th Cir. 1991). However, the non-moving party may not rely on beliefs, conjecture, speculation, or conclusory allegations to defeat a motion for summary judgment. Barber v. Hosp. Corp. of Am., 977 F.2d 874-75 (4th Cir. 1992). The evidence relied on must meet "the substantive evidentiary standard of proof that would apply at a trial on the merits." Mitchell v. Data General Corp., 12 F.3d 1310, 1316 (4th Cir. 1993).

To show that a genuine dispute of material fact exists, a party may not rest upon the mere allegations or denials of his pleadings. See Celotex, 477 U.S. at 324. Rather, the party must present evidence supporting his or her position by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials." Fed.R.Civ.P. 56(c)(1)(A); see also Cray Communications, Inc. v. Novatel Computer Systems, Inc., 33 F.3d 390 (4th Cir. 1994); Orsi v. Kickwood, 999 F.2d 86 (4th Cir. 1993); Local Rules 7.04, 7.05, D.S.C.

## IV.    DISCUSSION

### A.    Hostile Work Environment

Brown alleges that he was subjected to a racially hostile work environment in violation of both Title VII and 42 U.S.C. § 1981. Title VII prohibits an employer from subjecting an employee to a hostile work environment because of the employee's protected class. 42 U.S.C. § 2000e–2(a)(1). Similarly, section 1981 prohibits discrimination based upon race that interferes with a contractual

-14-

interest. "At will employment in South Carolina is contractual in nature and may support a claim under Section 1981." Sellers v. South Carolina Autism Soc., Inc., No. 11–2163, 2012 WL 988064 at * 4 (D.S.C. March 22, 2012). To survive a motion for summary judgment on a claim of a racially hostile work environment in violation of Title VII or § 1981, a plaintiff must show that there is a genuine issue of material fact as to whether the offending conduct was 1) unwelcome, 2) based upon race, 3) sufficiently severe or pervasive to alter the conditions of his employment and create an abusive work environment, and 4) imputable to his employer. Ziskie v. Mineta, 547 F.3d 220, 224 (4th Cir.2008).[5] Defendant argues that Brown fails to show that the unwelcome conduct was based upon his race, was sufficiently severe and pervasive, or that there is any basis for imputing liability to CSXT.

First, to establish that the alleged conduct was based on race, Brown must show that, but for his race, he would not have been the victim of the alleged conduct. Gilliam v. S.C. Dep't of Juvenile Justice, 474 F.3d 134, 142 (4th Cir. 2007). Viewing the evidence in the light most favorable to Brown, Beverly made several racially-charged comments to (or within earshot of) Brown during his employment: one of those "straight off the boat from Africa blacks," Brown Dep. 131; and "black as tar," Brown EEOC Affidavit. Beverly also referred to Brown as a "DAN," "LAN, and "SAN railer," which Brown believed stood for "dumb ass nigger," "lazy ass nigger," and "stupid ass

_____

[5]The standards applicable to lawsuits under § 1981 are the same as the standards applicable to lawsuits under Title VII, with the same caselaw being used to evaluate a claim under either statute. See Ross v. Kansas City Power & Light Co., 293 F.3d 1041, 1050 (8th Cir.2002) ("In analyzing a claim ... under section 1981, we apply the same standards as in a similar Title VII claim."); Long v. First Union Corp. of Virginia, 894 F.Supp. 933, 945 (E.D.Va.1995); Kim v. Nash Finch Co., 123 F.3d 1046,1063 (8th Cir.1997).

nigger," respectively.  Brown Dep. 134-36.[6]  Brown does not assert that he ever heard Beverly use the word "nigger," only that these DAN, LAN, and SAN words were code for such language.[7]

Race-related comments are sufficient to establish that the unwelcome conduct was based upon race.  See, e.g., EEOC v. Xerxes Corp., 639 F.3d 658, 671 (4th Cir. 2011) ("Wilson testified that Tammy Smith used racially-tinged names when addressing him. If the facts are as asserted by Pearson and Wilson, they would constitute racial harassment sufficient to alter the conditions of employment and create an abusive atmosphere.").   Furthermore, the Fourth Circuit has described the word "nigger" as "an unambiguously racial epithet."Spriggs v. Diamond Auto Glass, 242 F.3d 179, 189 (4th Cir. 2001); see also White v. BFI Waste Servs., LLC, 375 F.3d 288, 298 (4th Cir. 2004) (holding that use of terms including "boy," "jigaboo," "nigger," "porch monkey," "Mighty Joe Young," and "Zulu warrior" created triable issue of fact on hostile work environment claim).

With respect to Turner and Clayton, Brown raises several examples of the poor treatment he felt he received from them, but only a handful of the complaints noted by Brown even arguably have any racial overtones.  Brown asserts that Turner called him "bo" and once stated "you folks can't afford that" when discussing real estate.  Brown Dep. 131-33.  As to Clayton, Brown overheard him

---

[6]Brown also points to other names Beverly called him to others but not to Brown, such as Beverly telling McWhite that Brown was "a lazy nigger," McWhite EEOC Affidavit; telling Turner that Brown was a "lazy ass African," a "lazy nigger," and a "damn monkey."  Id.

[7]Use of the acronym "DAN" for "dumb ass nigger" has been raised in several other cases involving a racially hostile work environment claim.  See. e.g., Brown v. Nucor Corp., 576 F.3d 149, 151 (4th Cir. 2009); Battle v. McHugh, No. 1:11-cv-2658-VEH, 2013 WL 3150155,  *4, 13 (N.D.Ala. June 14, 2013); Hammond v. Taneytown Volunteer Fire Co., No. CCB-09-0746, 2009 WL 3347327, *1, 3 (D.Md. Oct. 13, 2009); Streeter v. City of Pensacola, No. 05–CV–286, 2009 WL 248103 (N.D.Fla.2009); Bennett v. Nucor Corp., No. 3:04-cv-291-SWW, 2007 WL 2333193, *5-6 (E.D.Ark. Aug. 13, 2007); Sidari v. Orleans County, No. 95-cv-7250, 2000 WL 33407343, *4 (W.D.N.Y. Oct. 3, 2000); Norris v. City of Anderson, 125 F.Supp.2d 759, 763 (D.S.C. 2009).

say during a phone conversation about assigning Brown to manual labor that he was "going to get blackered today" and, on another occasion, Clayton told Brown he he does not "listen to that music you people listen to."  Brown Dep. 69.  Although the undersigned is not convinced that these comments by Turner and Clayton are sufficiently race-based to be actionable under Title VII, even if they were, for the reasons discussed below, they are not sufficiently severe or pervasive to create an abuse working environment.

Defendant next argues that the offensive conduct suffered by Brown was not sufficiently severe or pervasive to alter the conditions of his employment and create an abusive work environment.  To show that the conduct was sufficiently severe or pervasive, Plaintiff must establish that the environment was "both objectively and subjectively offensive, one that a reasonable person would find hostile or abusive, and one that the victim in fact did perceive to be so." Faragher v. City of Boca Raton, 524 U.S. 775, 787, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998) (citing Harris v. Forklift Sys., Inc., 510 U.S. 17, 21–22, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993)).  Actionable harassment occurs when the workplace is "permeated with discriminatory intimidation, ridicule, and insult." Harris, 510 U.S. at 21.

Importantly, "conduct that is either pervasive or severe may give rise to a hostile work environment[;] ... even one act of harassment will suffice if it is egregious." Whitten v. Fred's, Inc., 601 F.3d 231, 243 (4th Cir.2010), overruled on other grounds (quoting Cerros v. Steel Techs., Inc., 398 F.3d 944, 950 (7th Cir.2005)) (emphasis added); see also Faragher v. City of Boca Raton, 524 U.S. 775, 788, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998) (noting that, while isolated incidents generally do not show an objectively hostile work environment, if a single incident is "extremely serious," it may be sufficient to state a claim).

-17-

However, Title VII is not a "general civility code." Oncale v. Sundowner Offshore Services, Inc., 523 U.S. 75, 80, 118 S.Ct. 998, 140 L.Ed.2d 201 (1998). "Workplaces are not always harmonious locales, and even incidents that would objectively give rise to bruised or wounded feelings will not on that account satisfy the severe and pervasive standard." EEOC v. Sunbelt Rentals, Inc., 521 F.3d 306, 315 (4th Cir.2008).

The Fourth Circuit has established a four factor approach to evaluate the totality of the circumstances in determining whether conduct is severe or pervasive: (1) the frequency of the discriminatory conduct; (2) its severity; (3) whether it was physically threatening or humiliating, or a mere offensive utterance; and (4) whether the conduct unreasonably interfered with plaintiff's work performance. Connor v. Schrader Bridgeport Int'l, Inc., 227 F.3d 179, 193 (4th Cir.2000).

With respect to Turner and Clayton, the incidents about which Brown complains describe, at most, a "limited number of incidents that are more reflective of run of the mill uncouth behavior than an atmosphere permeated with discriminatory ridicule and insult." Racicot v. Wal–Mart Stores, Inc., 414 F.3d 675, 678 (7th Cir.2005). The incidents must be more than mere offensive utterances-they must create an atmosphere that is "permeated" with ridicule and insult. Harris, 510 U.S. at 21. "Simple teasing, offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the 'terms and conditions of employment.' " Faragher, 524 U.S. at 788, (citation and internal quotation marks omitted). While the comments made by Turner and Clayton may have been insensitive and uncouth, they are not sufficiently severe or pervasive to create an abusive working environment. As the Fourth Circuit has observed, "Title VII is not a federal guarantee of refinement and sophistication in the workplace." Hartsell v. Duplex Products, 123 F.3d 766, 773 (4th Cir.1997); Ocheltree, 335 F.3d at 333. Because Brown cannot show that the

-18-

comments made by Turner or Clayton were sufficiently severe or pervasive to create an abusive work environment, his hostile work environment claim fails with respect to them.

The behavior alleged with respect to Beverly is more involved. Brown asserts that his interactions with Beverly during the nine months he worked with him were regular, averaging two weeks per month, and that during the time he worked with Beverly, the harassment was nearly constant. Brown Decl. ¶ 15. Further, although Defendant argues that Brown presents no proof, other than his own assumption, that the words "DAN," "LAN," and "SAN" were acronyms for the clearly offensive phrases "dumb ass nigger," "lazy ass nigger," and "stupid ass nigger," case law reveals that other individuals have at least recognized "DAN" to mean as much. As is often quoted by courts within the Fourth Circuit, "far more than a 'mere offensive utterance,' the word 'nigger' is pure anathema to African-Americans. 'Perhaps no single act can more quickly alter the conditions of employment and create an abusive working environment than the use of an unambiguously racial epithet such as 'nigger' . . . .'" Spriggs, 242 F.3d at 185 (citing Rodgers v. Western-Southern Life Ins. Co., 12 F.3d 668, 675 (7th Cir.1993)). Here, Brown has presented sufficient evidence to create an issue of fact as to whether Beverly's conduct was sufficiently severe or pervasive to create a hostile work environment.

The final prong necessary to establish a hostile work environment claim is to show that the harassing conduct is imputable to the employer. Because Brown has failed to present sufficient evidence to create an issue of fact as to whether Turner or Clayton's behavior was sufficiently severe or pervasive, the court need only consider whether Beverly's conduct is imputable to CSXT. Harassing conduct is automatically imputable to the employer if the offending individual is the plaintiff's supervisor. Faragher, 524 U.S. at 807; Ellerth, 524 U.S. at 765. Recently, in Vance v. Ball

-19-

State University, the Supreme Court recognized that Ellerth and Faragher left open the issue of who qualifies as a supervisor for vicarious liability purposes under Title VII. Vance, 2013 WL 3155228, * 3. The Court in Vance addressed the split in circuit authority as to whether supervisor status requires "the power to hire, fire, demote, promote, transfer, or discipline the victim" or whether such status is tied to "the ability to exercise significant direction over another's daily work." Id. at *7 (citations omitted). The Vance Court held that

> an employer may be vicariously liable for an employee's unlawful harassment only when the employer has empowered that employee to take tangible employment actions against the victim, i.e., to effect a "significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits."

Id. (citations omitted). The Court rejected the opposing "nebulous definition" of supervisor, which would provide supervisory status to employees who "have the ability to direct a co-worker's labor to some ill-defined degree," as adopted by several courts of appeal, including the Fourth Circuit in Whitten v. Fred's, Inc., 601 F.3d 231, 245–247 (4th Cir. 2010). Id.

Here, the evidence reveals that Beverly had no real supervisory authority over Brown. Although roadmasters hand out daily assignments to union workers, they have limited disciplinary authority and cannot take "tangible employment actions" against other employees – management or non-management - within the meaning of Title VII. Moore Dep. 127-28 (Roadmasters have no authority to accept bids or award jobs to employees); Beverly Dep. 140 (Roadmasters are not responsible for the hiring or firing of employees, do not decide disciplinary actions for employees, cannot promote or demote employees, and do not evaluate the job performance of employees); see also Moore Decl. ¶ 6 ("Roadmasters do not have authority to discipline union employees or management employees, such as Assistant Roadmasters or Management Trainees."). Brown admits

that Beverly was not involved in his promotion to Assistant Roadmaster, and that he has never seen Beverly fire or promote anyone.  Brown Dep. 183-84.  Beverly testified that he did not even have the authority to "assign [Brown] anywhere." Beverly Dep. 157.  Thus, it does not appear that Beverly had the authority to fire, discipline, promote, demote, or otherwise affect the terms and conditions of Brown's employment, he cannot be considered a supervisor.

Nevertheless, Beverly's harassing conduct is imputable to CSXT if CSXT "was negligent in failing, after actual or constructive knowledge, to take prompt and adequate action to stop it." Howard v. Winter, 446 F.3d 559, 567 (4th Cir. 2006).[8]  An employer "cannot avoid Title VII liability for coworker harassment by adopting a 'see no evil, hear no evil' strategy. Knowledge of harassment can be imputed to an employer if a reasonable person, intent on complying with Title VII, would have known about the harassment."  Ocheltree v. Scollon Prod., Inc., 335 F.3d 325, 334 (4th Cir.2003).  In this vein, an employer "may be charged with constructive knowledge of coworker harassment when it fails to provide reasonable procedures for victims to register complaints." Id. However, "[t]he law against harassment is not self-enforcing and an employer cannot be expected

---

[8]Brown and, to some extent, Defendant, after addressing whether Beverly qualifies as Brown's supervisor for the purpose of automatically imputing liability to CSXT, moves on to a discussion of the Ellerth/Faragher affirmative defense, which a defendant may utilize when the harassing individual is a supervisor.  Spriggs, 242 F3d at 186. However, because Beverly was not Brown's supervisor, it is unnecessary to address the Ellerth/Faragher affirmative defense.  See Bland v. Fairfax County, Va., 2011 WL 3421568 n.4 (E.D.Va. Aug. 3, 2011) (noting that the Ellerth/Faragher defense is inapplicable to cases of coworker harassment).  Liability can still be imputed to CSXT if, as set forth above, it was negligent in failing, after actual or constructive knowledge, to take prompt and adequate action to stop Beverly's harassing conduct.  Although the elements required to establish the Ellerth/Farragher defense are similar to those required to impute liability for a co-worker's harassment, the burden of proof is not.  Imputing liability to the employer for a co-worker's harassment is an element required for a hostile work environment claim and, thus, the burden remains with Plaintiff to present sufficient evidence to create a dispute of fact on this issue.

to correct harassment unless the employee makes a concerted effort to inform the employer that a problem exists. Barrett v. Applied Radiant Energy Corp., 240 F.3d 262, 268 (4th Cir.2001). Ultimately, courts "must determine when [CSXT] had actual or constructive notice of [Beverly's] alleged harassing behavior and whether the [CSXT's] response was reasonable once such notice was provided." Howard, 446 F.3d at 567.

Brown complained to Turner about the racial slurs he was called by Beverly on at least three occasions, in approximately September and November 2010, then again in approximately March 2011. Brown Dep. 143-45. Brown reported that Beverly was calling him "SAN," "LAN," and "DAN" and detailed for what these acronyms stood. Brown Dep. 135-36, 139-140. The first time Brown complained, Turner said, "That's just Chad." Brown Dep. 140-41. Turner did not put a stop to it. Brown Dep. 139-40. Brown complained again, approximately two months later, saying that Beverly was "still doing the same things. He's calling me a lazy ass nigger, but he's using code words. He's saying LAN, you know. Can you do something about it?" Brown Dep. 142. Turner said "that would be Chad. I'll talk to him." Brown Dep. 142. Turner did not report Brown's complaints of racial harassment nor did he put a stop to the harassment. Brown Dep. 143, 216-17. Beverly's behavior did not change. Id.

Defendant argues that liability for Beverly's conduct cannot be imputed because Brown never called Human Resources or the Ethics Hotline (specifically provided by CSXT for complaints of harassment) as required by the ant-harassment policy. However, the relevant inquiry is therefore whether the employee adequately alerted his employer to the harassment, not whether he followed the letter of the reporting procedures set out in the employer's harassment policy. See, e.g., Cerros v. Steel Technologies, Inc., 398 F.3d 944, 952-53 (7th Cir. 2005) (citing Crowley v. L.L. Bean, Inc.,

303 F.3d 387, 403 (1st Cir.2002) (rejecting L.L. Bean's contention that the plaintiff "did not properly notify management of her complaints because she 'bypass[ed] the reporting requirements under L.L. Bean's harassment policies,'" given that she "repeatedly alerted team leaders and supervisors" to the misconduct (internal citation omitted)); Nichols v. Azteca Rest. Enters., Inc., 256 F.3d 864, 876 & n. 10 (9th Cir.2001) (observing that, although the plaintiff's complaints to his managers "did not follow the formal reporting requirements of Azteca's anti-harassment policy, they were sufficient to place the company on notice of harassment")).  Thus, because Brown complained to Turner on several occasions regarding Beverly's racial comments, CSXT was on notice of the racial harassment Brown was allegedly suffering.  However, the evidence in the record indicates that neither Turner nor anyone else at CSXT ever took any action in response to Brown's complaints of racial harassment by Beverly.  Thus, Plaintiff has presented sufficient evidence to at least create an issue of fact as to whether Defendant was negligent in failing to take prompt and adequate action to stop the harassment.  Accordingly, summary judgment is not appropriate on Plaintiff's claim of a hostile work environment as created by Beverly.

### B.    Retaliation

Title VII makes it an "unlawful employment practice for an employer to discriminate against any of his employees ... because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter."  42 U.S.C. § 2000e-3(a).

To establish a prima facie case of retaliation under Title VII, a plaintiff must show (1) he engaged in protected activity, (2) the employer took adverse employment action against him, and (3) a causal connection existed between the protected activity and the adverse action.  Ross v.

-23-

Communications Satellite Corp., 759 F.2d 355, 365 (4th Cir.1985); Laughlin v. Metropolitan Washington Airports Authority, 149 F.3d 253, 258 (4th Cir.1998); Causey v. Balog, 162 F.3d 795, 803 (4th Cir.1998). If Plaintiff establishes a prima facie case, Defendant can rebut the presumption of retaliation by articulating a non-retaliatory reason for its actions. At that point, Plaintiff has the opportunity to prove that Defendant's legitimate, non-retaliatory reason is pretextual. See Matvia v. Bald Head Island Management, 259 F.3d 261, 271 (4th Cir.2001).

To establish "protected activity," Plaintiff must show she opposed an unlawful employment practice which she reasonably believed had occurred or was occurring. Bigge v. Albertsons, Inc., 894 F.2d 1497, 1503 (11th Cir.1990); see also Ross, 759 F.2d at 355 n. 1 (stating that a Title VII oppositional retaliation claimant need not show that the underlying claim of sexual harassment was in fact meritorious in order to prevail). "[T]he 'opposition clause,' by its very terms, requires that the employee at least have actually opposed employment practices made unlawful by Title VII. That is to say, the clause protects opposition neither to all unlawful employment practices nor to practices the employee simply thinks are somehow unfair." McNair v. Computer Data Sys., Inc., 172 F.3d 863, 1999 WL 30959, at *5 (4th Cir. Jan.26, 1999) (unpublished). Brown's EEOC Charge of Discrimination clearly constitutes protected activity. With respect to Brown's complaints to Turner, Defendant argues that they do not constitute protected activity because Turner was one of Brown's alleged harassers and complaints to the harasser do not constitute protected activity. However, Brown was not complaining to Turner about Turner, he was complaining about Beverly's racial harassment. Thus, Defendant's argument in this context is without merit.

Defendant next argues that Brown fails to show that he suffered any adverse employment actions as a result of his complaints or his EEOC Charge of Discrimination. The Supreme Court has

clarified that a different and less strenuous standard is used to define adverse employment actions in the retaliation context as opposed to other Title VII contexts: "[T]he anti-retaliation provision, unlike the substantive provision, is not limited to discriminatory actions that affect the terms and conditions of employment." Burlington Northern & Santa Fe Rwy. v. White, 548 U.S. 53, 64, 126 S.Ct. 2405, 165 L.Ed.2d 345 (2006). However, the anti-retaliation provision "protects an individual not from all retaliation, but from retaliation that produces an injury or harm." Id. at 67. Thus, "a plaintiff must show that a reasonable employee would have found the challenged action materially adverse, which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." Id. at 68 (quotation marks and citations omitted).

Brown asserts that, following his complaints about Beverly to Turner, he was transferred to undesirable duty stations far from his home and that he received a negative performance review. In addition, following his EEOC Charge, he was again transferred to another duty station far from his home, the locks on his company vehicle were broken, he saw what he describes as a Nazi bolt symbol on a desk in the briefing room, and a memorandum was placed in his file regarding his failure to follow instructions.

The Fourth Circuit has held that a negative performance evaluation that caused the plaintiff not to receive a discretionary financial bonus[9] was insufficient to constitute a materially adverse action. Parsons v. Wynne, No. 06–1876, 2007 WL 731398 (4th Cir. Mar. 9, 2007). Thus, Brown fails to show that he suffered a materially adverse employment action with respect to his

---

[9]In Parsons, the court held that the plaintiff had failed to prove would have otherwise been entitled to the bonus. Parsons, 2007 WL 731398, **1. Here, Defendant argues that, other than Brown's own testimony, he fails to show that he was entitled to any particular bonus or that his 2011 performance review had any effect on the bonus he received.

performance evaluation or the memorandum placed in his file.  In addition, the broken locks and the Nazi symbol located in a common area would not dissuade a reasonable employee from making or supporting a charge of discrimination.  Thus, these events also fail to rise to the level of materially adverse actions.

However, in Burlington, the Supreme Court noted that the reassignment of job duties may be materially adverse under Title VII depending on the circumstances of the particular case. Burlington, 548 U.S. at 71.  Here, the record shows that Brown was transferred to duty stations in Apex, North Carolina, Charlotte, North Carolina, and Laurens, South Carolina, each far from his home in Charleston, South Carolina.  In addition, his transfer to Charlotte required working under someone about whom had recently complained.  Thus, Plaintiff has presented sufficient evidence to create an issue of fact as to whether the transfers were materially adverse.

Next, Brown must present evidence sufficient to show a causal connection between his protected activity and the adverse action.  To meet the causal connection requirement, a plaintiff must show that the adverse action would not have occurred "but for" the protected conduct.  Ross v. Communications Satellite Corp., 759 F.2d 355, 365-66 (4th Cir.1985) overruled on other grounds by Price Waterhouse v. Hopkins, 490 U.S. 228 (1989).  "A causal relationship [between protected activity and adverse action] requires more than simple coincidence.  Causation requires the employer's action be the consequence of the protected activities and of nothing else." Bray v. Tenax Corp., 905 F. Supp. 324, 328 (E.D.N.C. 1995).

A causal connection can be established based on temporal proximity alone, that is, where the employer takes adverse employment action against an employee shortly after learning of the protected activity. Williams v. Cerberonics, Inc., 871 F.2d 452, 457 (4th Cir.1989).  Brown asserts

-26-

that he was transferred to the Apex, North Carolina duty station within several weeks of making his third complaint to Turner about Beverly's racial comments in March of 2011 and then, several weeks later, was again transferred to the duty station in Laurens, South Carolina.  In addition, following Brown's EEOC Charge of Discrimination in September of 2011, Turner transferred Brown to the Charlotte duty station in October of 2011.  These transfers, which occurred approximately one month after Brown's protected activities, are sufficiently close in time to the protected conduct to establish a causal connection based upon temporal proximity alone.  As such, Brown has presented sufficient evidence to create a prima facie case of retaliation.  Because Defendant fails to present a legitimate, non-retaliatory reason for these transfers, summary judgment is not appropriate.

## V.     CONCLUSION

In sum, viewing the facts in the light most favorable to Brown, he has presented sufficient evidence to create a genuine dispute of material fact as to whether CSXT is liable for a racially hostile work environment and as to whether Turner retaliated against him for his complaints of racial harassment.  Accordingly, it is recommended that Defendant's Motion for Summary Judgment as to Plaintiff Darryl Brown's claims (Document # 85) be denied.


                                                             s/Thomas E. Rogers, III
                                                            Thomas E. Rogers, III
                                                            United States Magistrate Judge

August 21, 2013
Florence, South Carolina

-27-