UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH CAROLINA
FLORENCE DIVISION

| | | |
|---|---|---|
| GREGORY D. BETHEA, WILLIAM OLIVER, AVERY JETT, DARRYL E. BROWN and EARNEST McWHITE, | ) ) ) | Civil Action No.: 4:11-cv-1569-RBH-TER |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| -vs- | ) | **REPORT AND RECOMMENDATION** |
| | ) | |
| | ) | |
| CSX TRANSPORTATION, | ) | |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

## I.     INTRODUCTION

This employment case arises out of Plaintiffs'[1] employment with Defendant CSX Transportation (CSXT or Defendant). Plaintiffs allege they were subjected to a hostile work environment and retaliation in violation of Title VII of the Civil Rights Act of 1964 (Title VII), 42 U.S.C. § 2000(e) et seq. and 42 U.S.C. § 1981. Presently before the Court is Defendant's Motion for Summary Judgment as to Plaintiff Earnest McWhite's claims (Document # 86). All pretrial proceedings in this case were referred to the undersigned pursuant to the provisions of 28 U.S.C. § 636(b)(1)(A) and (B) and Local Rule 73.02(B)(2)(g), DSC. Because this is a dispositive motion, this Report and Recommendation is entered for review by the district judge.

---

[1]Plaintiffs Bethea, Oliver and Jett have been dismissed from this action. The only Plaintiffs remaining are Brown and McWhite.

## II.    FACTS

### A.    CSXT

CSXT is a railroad transportation company operating in the Eastern United States and headquartered in Jacksonville, Florida. Nihoul Decl. ¶ 2 (Document # 101-6).CSXT employs approximately 31,000 workers, most of whom are unionized and governed by collective bargaining agreements and the federal Railway Labor Act (RLA). Nihoul Decl. ¶ 3. Collective bargaining agreements govern many of the workplace rules and procedures, such as job selection for union positions, the "rolling"[2] of employees, grievance procedures and seniority.  Id.   Prior to his acceptance in the Management Trainee Program, McWhite was a member of the Brotherhood of Maintenance of Way union at CSXT.  McWhite Dep. 62-63 (Document # 95-1).

CSXT is divided organizationally into departments and geographically into regions and divisions. Nihoul Decl. ¶ 4. The Florence Division is based in Florence, SC and runs along the east coast from Richmond, Virginia to Augusta, Georgia. Bethea Dep.66 (Document 109-1); see also Phipps Dep. 57-58 (Document 99-1).  Maintenance of Way (MOW) is a subset of the Engineering Department that is responsible for repair and maintenance of CSXT's railroad track. Bethea Dep. 105-06. The Florence MOW is headed by a Division Engineer. Moore Dep. 31 (Document # 96-1). The Division Engineer supervises several Engineers of Track,[3] to whom the Roadmasters and

---

[2]"Rolling" (or displacement as it is formally defined under the collective bargaining agreement) is also commonly known in labor law as "bumping." It occurs when one union employee loses his or her position and exercises his seniority rights to displace another employee with lesser seniority and assumes that employee's position. Nihoul Decl. ¶ 7; McWhite Dep. 212. After being rolled, an employee has the ability to "roll" employees in other positions if he has greater seniority in the position. Nihoul Decl. ¶ 7; McWhite Dep. 212.

[3]The title changed from Assistant Division Engineer to Engineer of Track sometime in the 1990s. Moore Dep. 31.

Assistant Roadmasters report. Nihoul Decl. ¶ 5; Phipps Dep. 56. Within MOW, the Florence Division is subdivided into smaller geographic units that are each assigned to a Roadmaster who is responsible for maintenance of the track in that area. Moore Decl. ¶ 5 (Document # 101-3). Although only subsections of the larger Division, a Roadmaster's territory may nonetheless cover hundreds of square miles.

### B.    CSXT Anti-Discrimination Policies

CSXT maintains policies that strictly prohibit all forms of discrimination and retaliation. Willis Dep. 29-33 & Exs. 13, 14 (Document # 116). CSXT disseminates these policies widely to employees, and reinforces them with comprehensive training programs, postings throughout work sites, and postings on the CSXT Employee Services Intranet Homepage. Downey Decl. ¶ 2 (Document # 118). CSXT policy prohibits discrimination, including harassment based on race, color, religion, sex, age, national origin, disability, and any other basis protected by federal or state law. McWhite Dep. 77-78 & Exs. 3-6. CSXT policy also prohibits retaliation against any individual who brings a complaint of harassment or discrimination or who participates in the investigation of such a complaint. Id. at Exs. 3-6. McWhite was aware of, and participated in training on CSXT's policy regarding equal employment opportunity, discrimination, harassment, and retaliation. Id. at 77-78. As a manager, McWhite was also responsible for implementing these same policies. Id. at 78-79.

In conjunction with these policies, CSXT maintains an Ethics Hotline that is available to all employees who wish to report violations of the EEO, discrimination, harassment, and retaliation policies, or any other issues or complaints. Willis Dep. 23 & Ex. 14. CSXT policy expressly states that if an employee feels he or she has encountered harassment or discrimination in the workplace, that individual should "immediately report the incident to your Human Resources Representative,

or the CSX Ethics Information Toll Free Hotline at 1-800-737-1663." Id.  The number for the Ethics

Hotline is also posted in most, if not all, company facilities at CSXT.  Moore Dep. 69-71.  McWhite

was aware of the Ethics Hotline's existence, and knew he could call if he had any complaints or

issues with CSXT.  McWhite Dep. 94.

### C.    McWhite's Employment with CSXT

McWhite began working for CSXT in August 2007, when he was hired as a track worker

(also known as a trackman) in the company's Maintenance of Way Department in Sumter, South

Carolina. McWhite Dep. 70-72 & Ex. 8.  During his employment with CSXT, McWhite has worked

in a number of different union jobs within Maintenance of Way, under different leadership, and in

different locations around North and South Carolina.  McWhite Dep. 129-30 & Ex. 8. As a union

employee, McWhite had the ability to bid on any union position for which he was qualified, which

would include positions in a variety of geographic locations, under different supervisors and working

on the track overseen by different Roadmasters.  Nihoul Decl. ¶ 10; McWhite Dep. 111, 120.

In March 2011, McWhite applied for a position in the company's Management Trainee

program in order to become an Assistant Roadmaster.  McWhite was recommended for the program

by Roadmaster Chad Beverly, Beverly Dep. 63 (Document # 90-1), and selected by Bobby Moore,

Moore Dep. 73-74.  After beginning the Management Trainee Program in March 2011, McWhite

spent approximately one month in Atlanta for classroom training.  Webb Decl. ¶ 2. When McWhite

was reassigned to the Florence Division after his classroom training, McWhite's supervisor was

Division Engineer Bobby Moore, and he trained with the following Roadmasters: Chad Beverly in

Florence, David Poleston in Yemassee, Brad Clayton in Charleston, Stephen Love in Cayce, and

Brad Reyes in Augusta. McWhite Dep. 112-15.

-4-

In August 2011, Webb consulted Moore regarding McWhite's readiness for placement in a full-time position after McWhite finished all of the critical items required for training. Webb Decl. ¶ 5. Moore stated that McWhite was ready for promotion at that time, but a position was not immediately available in the Florence Division due to a lack of openings. Id.; Moore Decl. ¶ 8; Moore Dep. 74.

As soon as a vacancy on the Florence Division occurred, on December 6, 2011, McWhite was promoted by Moore to the position of Roadmaster, skipping over the Assistant Roadmaster position. Moore Decl. ¶¶ 8-9; Webb Decl. ¶ 6; McWhite Dep. 115. He was the first in his training class to become a Roadmaster, and the only one who bypassed the Assistant Roadmaster position. Webb Decl. ¶¶ 6-7. In fact, McWhite is unaware of any other person at CSXT who has been promoted to Roadmaster directly from Management Trainee without first being an Assistant Roadmaster. McWhite Dep. 115. Since his promotion, McWhite has been based in Laurens, South Carolina. McWhite Dep. 130.

### D.    Beverly's Employment with CSXT

A dispute exists as to whether Beverly was McWhite's supervisor. Chad Beverly has been a Roadmaster in the Florence Division since approximately March 2008. Beverly Dep. 71. Beverly has been assigned to Florence, South Carolina since approximately January 2009. Id. He oversees and is involved with maintenance and inspection of the track, Moore Decl. ¶¶ 5-6, but he asserts that he is not a supervisor of any CSXT employees, Beverly Dep. 62. He cannot hire, fire, promote, demote, or issue discipline, nor does he evaluate employee performance for purposes of performance reviews or employee evaluations. Beverly Dep. 62, 65, 81, 154. McWhite worked in various union positions in Beverly's Florence territory from approximately February 2008 through January 2010

and March 2010 through March 2011.  McWhite Dep. Ex. 8.

At no time while McWhite was in the Management Trainee Program was his performance evaluated by Beverly, Webb Decl. ¶ 3; McWhite Dep. 166-68, nor was Beverly his supervisor, Webb Decl. ¶ 3; McWhite Dep. 112; Beverly Dep. 62. McWhite's performance was evaluated by Leonard Webb, CSXT's Manager Management Trainee Department, who is based in Atlanta, and was based in part on input from Moore and in part from online training documentation completed by McWhite. Webb Decl. ¶ 3.

McWhite identifies Beverly as his supervisor.  In support, he points to the numerous instances where Beverly threatened to terminate McWhite.  He also argues that no one ever told him that Beverly was not his supervisor or that he could not carry out his threats to terminate McWhite's employment. McWhite also points to Beverly's deposition testimony, in which he states that after McWhite entered the Management Training Program, he continued to work "under my direction." Beverly Dep. 81.  McWhite further asserts that Beverly continued to assign McWhite work while McWhite was a management trainee, including once sending him to inspect railroad yards in Georgetown, South Carolina. Id. at 148.

In addition, in notes taken during an investigation of Plaintiff's complaint, EEO Manger Shauna Watson stated that "[i]n February of 2010, Mr. Ernest McWhite worked as a Track Inspector for the Florence Division. Mr. McWhite's management supervisor at that time was Mr. William 'Chad' Beverly. Mr. McWhite reported that Mr. Beverly had threatened his job several times by saying he would terminate him for trivial reasons. Also, Mr. McWhite stated that Mr. Beverly attempted to validate his threats by bragging about his relationship with Engineer of Track, John Turner, and Division Engineer, Robert 'Bobby' Moore." Investigative Summary (Ex. D to McWhite

Response).

### E. McWhite's Complaint to the Ethics Hotline

On August 12, 2011, McWhite called the Company's Ethics Hotline and made an internal complaint of alleged harassment by Beverly. McWhite Dep. Ex. 15. The summary of his Hotline Report states, "Reporter [McWhite] alleges verbal abuse by (Roadmaster) William Beverly additionally reports Mr. Beverly put duck tape [sic] over a fellow employees mouth of which the Reporter witnessed." Id. McWhite reported that the harassment had been occurring since February 2010, and that management was unaware of the problem. Id. Subsequent to this call McWhite submitted a three-page handwritten statement of his allegations:

1) In February 2010, McWhite was working as a track inspector and got rolled by Brian Moore. After being rolled he was told to come in early so Brian could not get the truck and begin his job. Subsequently, McWhite went to the section in Florence, SC for a couple of months. After working on the extra gang for a couple of weeks, McWhite was asked to come back to Florence and Roadmaster Beverly told McWhite he and Division Engineer Bobby Moore were really close and he could get him fired. McWhite asked for advice from Harold Stanton, Jack Alford, and Assistant Roadmaster Steve Love, who questioned whether it was because McWhite was black. After Beverly saw that McWhite was getting upset, he apologized to McWhite and said he was sorry.

2) On Good Friday of 2011, Beverly told McWhite that he "was his bitch and he better not catch [McWhite] pissing standing up. [He] better always sit down or [he] will get a bad evaluation."[4]

3) On May 2, 2011, McWhite was told by Beverly that if he did not do what Beverly asked,

---

[4]Beverly testified that certain of McWhite's allegations, including this one, are from a conversation where Beverly and McWhite were quoting a television comedy show by black comedian Dave Chappelle. Beverly Dep. 29, 32.

Beverly would give him a bad evaluation and tell the Division Engineer and Engineer of Track, and he would get kicked out of the program.

4) On July 24, 2011, Beverly told McWhite that he asked McLaughlin[5] to take some tie plates to North Carolina, that she refused, and Beverly said "thats [sic] why that bitch is in Cayce, SC next week and he had me working in Florence, even though [McLaughlin] is placed in Florence."

5) On July 29, Beverly said that "Bobby Moore and John Turner was afraid of dealing with a woman[,] so that bitch doesn't have to do anything like hirailing or getting track time."

6) On August 1, 2011, Jordy Carter[6] told McWhite that when Carter left the Florence section for another location, Beverly texted his phone and said "I hope when you get to your new job I hope your truck derails and you get killed and I don't want you to see you to see your 26th birthday and you can never come back to Florence and work."

7) On August 1, 2011, Carter told McWhite that after he got rolled from Cayce, SC and returned to Florence, Beverly used his phone and texted JT Kennedy saying "oh, by the way, Chad [Beverly] did convince me to leave and come back to Florence."

8) On July 29, Beverly "took ducttape [sic] and put the tape all over employee Jordy Carter, all over his mouth and chest and it could have caused injury."

McWhite Dep. Ex. 16.

As a result of the complaint, CSXT interviewed 14 employees, including McWhite, Beverly and all of the individuals whom McWhite identified as persons who had personally witnessed the

---

[5]McLaughlin is Michelle McLaughlin, a white female.  Morris Dep. 144; McWhite Dep. 118.

[6]Carter is white.  Carter Dep. 27.

events in his allegations. Willis Dep. 121 & Exs. 8, 8(a) - 8(n). McWhite was interviewed by EEO Manager Shauna Watson on August 16. Call Center Records (Ex. F to McWhite Response); McWhite Interview (Ex. G to McWhite Response). During his interview, McWhite reported that Harold Stanton, Jack Alford, and Steve Love told him to tell the chairman that Beverly was discriminating against him because of race. McWhite Interview. When Watson asked, "Do you feel that was the reason?" McWhite stated '[t]here were other employees and he singled me out. He threatened me in form of [sic] R. J. Allison. He said I am the roadmaster here and me and DE are real tight and would get me disqualified." Id. When asked by Watson, "Do you think it [instructing other employees not to speak with him after he bidded off Beverly's section] was he lost a good employee and was upset or was it race," McWhite answered, "I think a little bit of both." Id.

Watson interviewed Beverly on August 18, 2011, and informed him of McWhite's complaint on that day. Beverly Interview (Ex. I to McWhite Response). Watson asked Beverly no questions about racial issues. Id. Beverly repeatedly lied to Watson during this interview, and testified that he didn't tell the truth because he felt "threatened and scared" upon receiving the call, even though he claimed "to have no clue any of this was going on," and that he "panicked." Beverly Dep. 40, 42. When Watson inquired about reports that Beverly had duct-taped an employee's mouth and body and rolled him into a safety meeting, Beverly told her "I didn't duct tape anyone. I don't know why they would make that up." Beverly Dep. 39-40; Beverly Interview; Investigation Records (Ex. M to McWhite Response). During his deposition, Beverly admitted that this "was an untrue statement that I made," as he did in fact duct-tape Carter to the chair and put duct tape over his mouth. Beverly Dep. 40-41. Watson's investigation concluded that Beverly did in fact duct-tape Carter and roll him into the safety meeting. Investigation Records. When asked, "Have you ever told Ernie McWhite

that He is your bitch and you better not catch him peeing standing up?", Beverly told Watson, "No, Ma'am." Beverly Interview. In follow-up, when asked "Why would someone make those accusations?", Beverly answered, "... I don't know why he would and I have worked together since his first day on the railroad..." Id.

The investigation into Plaintiff's complaints concluded that Beverly had "used inappropriate language in conversations with employees, including quoting certain offensive words and phrases used in a popular comedian's comedy routine," and "regularly engaged in 'joking' behavior including duct-taping an employee to a chair, and sending a personal text message from another employee's cell phone to make it appear that it had come from the employee." Investigative Summary.

On September 12, 2011, prior to any discipline being exacted on Beverly, McWhite filed a Charge of Discrimination with the EEOC. Morris Dep. Ex. 12. McWhite's Affidavit in support of his EEOC charge included numerous allegations of racially-charged comments made by Beverly. Id. In his Affidavit to the EEOC, McWhite asserts that he has been called "nigger," "coon," "monkey slave," and "lazy African" by lower and upper management at CSXT, all of whom are white, although he does not specifically identify these individuals. McWhite EEOC Affidavit. He further alleges he was told by Beverly that he was "stupid" and that he "couldn't learn because he was a "lazy, dumb nigger and wouldn't comprehend the railroad anyway." McWhite EEOC Affidavit(Ex. B. to McWhite's Response).

After McWhite's promotion into the Management Training Program, Beverly told him that he got his promotion "because CSXT has to have at least 3 Blacks at all times to keep Jesse Jackson and Al Sharpton off our asses." McWhite EEOC Affidavit. Beverly also told McWhite that the reason "we don't have Black Roadmasters or Black Division Engineers on the Florence Division is

-10-

that if we had more than 2 or 3 Blacks in these positions, the railroad would go to shit." Id.

Plaintiff's affidavit to the EEOC states "I have also witnessed the racial harassment of other African-American employees in the Florence Division. Their treatment has been similar to what I have endured. When Darryl Brown, an African-American, became Assistant Roadmaster on the Florence Division in February of 2011, I was ordered by Beverly to 'fuck with him to be sure that he fails.' ... Beverly also told me that Brown looked like 'a lazy nigger' and asked me 'who did he think he was.'" McWhite EEOC Affidavit.

Upon notice of McWhite's EEOC Charge of Discrimination, CSXT initiated another investigation conducted by Patricia Willis, Assistant Vice President of Employee Services, during which she conducted interviews of individuals identified in or with possible knowledge of the charge. Willis Dep. 98, 121, 124. Willis did not interview McWhite or Brown because they were already represented by counsel nor did she talk to any African-American employees or to any non-management employees because she "stuck to the scope of the investigation as determined by myself after talking with counsel." Willis Dep. 112. Based upon her investigation, Willis determined that none of the allegations in the EEOC Charge were corroborated. Id. at 113.

Based upon the findings in the initial investigation, Beverly received a final warning letter on December 8, 2011, which warned Beverly that further, similar conduct could result in termination, and he lost his entire bonus for the year, which usually amounted to several thousand dollars. Id.; Beverly Dep. 16-19.[7] According to Willis, Beverly was disciplined for duct-taping someone to a chair and sending a text message, not for any act of racial discrimination or harassment because "there was no racial component" to McWhite's hotline complaint. Willis Dep. 97; McWhite

---

[7]In his deposition, Beverly testified that his bonus for the prior year was between $10,000 and $20,000. Beverly Dep. 15-18.

Interview.

**F.     McWhite's Current Allegations of Harassment**

**1.     McWhite's Interactions with Beverly as a Non-Management Employee**

In the present action, McWhite raises a number of incidents at CSXT, other than the ones he previously raised to the Ethics Hotline, that caused him to feel harassed.  More than once in 2009,Beverly told McWhite to take the section track inspection trucks to Beverly's father-in-law's shop to get them worked on, and if McWhite said anything, he would get fired. McWhite Dep. 211. McWhite admits, however, that Beverly made other, white employees take trucks to his father-in-law's shop, too. McWhite Dep. 228-29.  It is undisputed that one of McWhite's job duties involved truck repair and that Beverly's father-in-law's maintenance shop is a CSXT vendor for vehicle repairs. Beverly Dep. 171.

McWhite alleges that about two and a half to three years ago (approximately 2009 or 2010), Beverly made McWhite clean Beverly's office, and threatened that he would lose his job if he did not do so.  McWhite Dep. 253-54.  Beverly and Turner testified that it is common for union employees to clean offices, or for the managers to even clean their office themselves.  Beverly Dep. 157-58; Turner Dep. 94-95 (Document # 100-1).

In late December 2009 or early January 2010, Beverly made him come in early to avoid having Brian Moore roll him off of his job as a track inspector.  McWhite Dep. 212.  McWhite admits, however, that Beverly probably did this because he was upset about losing McWhite. Id. at Ex. 16.

When McWhite was working on the extra gang 6F04 in 2010 (after bidding off the section of track which Beverly oversaw as Roadmaster), he was assigned to work on Beverly's territory on a project. McWhite Dep. 220.  While McWhite was there, Beverly told all of the men not to speak

to him and to ignore him and pretend like he didn't exist.  Id. at 225 & Ex. 8b.  Beverly came up to

McWhite and told him "you thought your black ass got away from me, didn't you." Id. at 221.  In

that same instance Beverly said to R.J. Allison, the black foreman of McWhite's crew, "R.J., I don't

know why people think they can bid off and leave me. I can still put my hands on them. I can still

put my hands on them and reach out and touch them." Id.  When McWhite asked Beverly what he

was talking about, Beverly said, "you bid off and left, but don't think I can have your job. . . . I got

Bobby Moore in my back pocket." Id.  In this same instance, Beverly "mentioned the fact that Mr.

Turner, Mr. Moore, and Mr. Johnson, and Mr. West -- he knows all of them.  If I want to keep my

job -- if I can remember correctly -- I might want to leave the Florence division. He made it clear to

me on several occasions that Mr. West calls him personally and has asked him to go turkey hunting."

Id. at 225-26.  McWhite believes that this "singling . . . out" was due to in part to Beverly being

upset that McWhite had bid off Beverly's section and in part because of race.  Id. at Ex. 8b.  Travis

Hackler, another member of this extra gang, testified that Beverly called the entire crew of black and

white employees together at one point and yelled at them because he was unhappy with their work.

Hackler Dep. 34 (Document # 92-1).

Sometime in 2010, Beverly told McWhite to cut up a dead horse beside the track, or that he

would otherwise "be looking for another job."  McWhite Dep. 208. McWhite asked if he could use

a backhoe to get the horse out of the way, and Beverly said no.  Id.  Harold Stanton (white) called

McWhite that afternoon and told him that Beverly told Stanton that Stanton was going to have to get

a chainsaw to cut the horse up.  Id. at 209-10.  McWhite did not cut the horse up, and was not fired

for not doing so. Id.  Part of McWhite's job as a track inspector was to remove dead animals from

the track.  Beverly Dep. 168, 174.

McWhite asserts that Beverly called McWhite "the black Miss Daisy" when McWhite drove

Beverly's truck. McWhite Dep. 214. He alleges this occurred approximately 15 times from 2009 to 2011. Id. at 215.

Beverly made McWhite go to different CSXT facilities and "steal" materials because Beverly ran out: Beverly "would always say to me and the other guys in Florence, every single -- the majority of the time, I already ordered it, but Cary Seavey won't approve it. . . . And if I didn't go to different locations and try to find stuff to work with, I would get fired." McWhite Dep. 231-33. McWhite alleges that Beverly said, "that's what you all used to anyway." Id. at 232. McWhite claims that this comment occurred approximately in 2009, and he was sent to look for materials more than once between 2009 and 2011. Id. at 234. Other employees have testified, however, that the practice of taking and utilizing materials from other Company locations was not "stealing," and was not atypical or prohibited. Turner Dep. 91-92 ("All material out there belongs to CSX."); Clayton Dep. 37 (Document # 103-1).

McWhite testified that Beverly used the word "nigger" on "several occasions" specifically recalls one time when he got out of Beverly's truck and Beverly said "something like, 'nigger, get your ass back in here so we can go.'" McWhite Dep. 247-48. This comment occurred between 2009 and 2011. Id. He remembers Beverly referring to another African American employee as "a lazy, dumb nigger." Id. at 254.

McWhite alleges that Beverly said to a group of employees once before an award celebration, "yeah, you all go on ahead. I got my little black bitch with me," when referring to McWhite. McWhite Dep. 216-17.

When asked if Beverly ever referred to him as a "monkey slave," as alleged in the Complaint, McWhite stated, "I can't remember the exact conversation. He would make comments such as that, monkey slave, on those lines, but I can't remember the exact conversation." Id. at 249-50. He then

stated that he did remember being called a "monkey slave," but could recall nothing else regarding the conversation, such as where or when it took place, or if anyone else was present.  Id.

When suggesting that McWhite apply for the management training program, Beverly told McWhite that "he should put in for management because Darryl [Brown]'s not cutting the mustard ... and sooner or later, they're going to need another black guy."  McWhite Dep. 172. Beverly explained that Plaintiff would be the "token black guy because Darryl [Brown] wasn't going to make it and Sam [former Road Master in Charlotte] wasn't all the way black."  Id.

### 2.    McWhite's Interactions With Beverly in the Management Trainee Program

After McWhite completed the Management Trainee classroom training, he told Beverly that he (Beverly) was his mentor and was going to have to evaluate him (McWhite), and then showed Beverly the evaluation checklist.  McWhite Dep. 166.  In response, Beverly balled up the evaluation sheet, threw it in the trash, and told McWhite "To stick it up [his] ass."  Id. at 168.  In this same conversation, Beverly asked McWhite if he was on crack because he had lost weight, and McWhite, in reply, told Beverly to quit talking to him that way because he (McWhite) was taking his job seriously, wanted to succeed, and didn't want to lose his job.  Id. at 169-70.  In response, Beverly said "fuck you."  Id.

In 2011, Beverly said to McWhite, "[Y]ou're a new manager now. Your black ass belongs to me. If I catch you pissing standing up, I'm going to fire your ass."  McWhite Dep. 206.  Beverly states, that he and McWhite "were joking about a skit from a Dave Chapel ski[t]. And Mr. Brown was there when we were joking about it. It was a joke and there was no threat of being fired or a bad evaluation. I did not evaluate Mr. McWhite."  Beverly Dep. 29.

Beverly told McWhite when he was a Management Trainee that if McWhite ever made

-15-

Assistant Roadmaster and got his own truck, that McWhite would probably have rims and windows tinted on it and "that's what all of the brothers do in the hood." McWhite Dep. 230.

Beverly demanded McWhite and Michelle McLaughlin (white) remove rail defect reports from the computer system. McWhite Dep. 253 & Ex. 8b. However, removing rail defect reports from the computer is a normal job duty. Turner Dep. 96-97 ("Somebody needs to go in there to learn how to do it. . . . [I]t's a training tool for assistants to know how to go in there and remove them once they're repaired. If they're repaired they got to come out."). In this instance, McWhite admits that Beverly left him paperwork for some of the defects, and that McWhite removed just those defects identified in the paperwork. McWhite Dep. Ex. 8b.

McWhite complains that one time in 2011, "Mr. Turner, Mr. Beverly were riding in Mr. Turner's Suburban, and Obama came up, and they were talking casual. We all were talking casual . . . and they were saying that the election was somehow or another rigged, and he was a token. And the comment was made to me that I'm in the same boat, and this when I was a trainee." McWhite Dep. 236. McWhite went on to say that Beverly made these specific comments, and that Turner said, "I kind of agree with Chad on that." Id. at 236-37.

McWhite admits, however, that Beverly's offensive behavior was not reserved for him or other black employees:

> Q: Did Mr. Beverly ever say things to other employees who were white that you thought were inappropriate or harassing or offensive, bad behavior?
> A. All the time.
> Q. What sort of things did he say to white employees that you thought were offensive or inappropriate?
> . . .
> A. Gay, fag, dumbass, hillbilly -- give me a second, I'm trying to think. Bitch, token.

McWhite Dep. 226-27. McWhite went on to give specific examples. Beverly called Chase Timmons (white) a "dumbass," "gay," and a "fag," Id. at 229, Jack Alford (white) a "dumb hillbilly,"

Id. at 230, Michelle McLaughlin (white) a "bitch" and a "token," Id., Stephen Love (white) "buddy

love," "gay," and "stupid," Id. at 234.  Beverly told McWhite to "work the shit out of his [Brad

Reyes'] (white) ass, and don't come in until his ass is dog tired, in the pouring-down rain." Id. at

234-35.  Testimony from other employees supports this. McLaughlin Dep. 7-10, 20-21, 33-34, 35,

47-48 (white employee stating that Beverly "talked down" and said inappropriate things to both

black and white employees); Carter Dep. 20, 22-30, 32-35 (white employee explaining that Beverly

"pick[ed]" on him at times, was "sarcastic" and a "smartass" with both black and white employees,

and was mad when he bid off his crew and told him he might "make it hard on [him]" if he came

back); Hackler Dep. 18-20, 34 (stating that Beverly did not talk differently to black employees and

once got angry with an entire gang of black and white employees).

McWhite did not report Beverly's numerous racial slurs to Human Resources because "I was

afraid for my job. Mr. Beverly made it crystal clear that he knew everybody else above the engineer

of track, Mr. Moore, he knew him real close and he could get my job. I was afraid for my job. That's

why I didn't go to nobody."  McWhite Dep. 259-260.  Michele McLaughlin heard Beverly tell

Plaintiff that because of his friendship with Mr. Moore and Mr. Turner, he could get his bonus (i.e.

get it taken away).  McLaughlin Dep. 38, 53. Similarly, R. J. Allison and Travis Hackler both

reported to EEO Manager Watson that they heard Beverly tell McWhite he could have him fired.

Allison Interview (Ex. J to McWhite Response); Hackler Interview (Ex. K to McWhite Response).

In his deposition, Allison confirmed that in 2010 Beverly told McWhite that he (Beverly) was close

to Division Engineer Moore and could have Plaintiff fired. Allison Dep. 6-7, 11. When asked if she

thinks people are afraid to talk, McLaughlin told HR "[y]es, even though you say there [sic] job

won't be jeopardized they have the mentality it will be" and "[t]he only other thing is Chad makes

it really clear Mr. Moore is in his pocket."  McLaughlin Interview (Ex. H to McWhite Response).

By this, McLaughlin meant that in her opinion, people were afraid to tell the company the truth about what was going on.  McLaughlin Dep. 23.

### 3.     McWhite's Interactions with Turner

McWhite recalls two instances when John Turner said anything he considered to be harassing. First, Turner asked him why Darryl Brown's skin was darker than his and whether Darryl was from Africa.  McWhite Dep. 193.  Beverly was present and responded that Darryl was from "some tribe in Africa."  Id. at 195.  Second, Turner made comments about McLaughlin such as he "couldn't stand her ass," "a woman doesn't have no place on the damn railroad," and "I don't know why the hell she got her ass in that division office. She better have her ass out here getting track time."  Id. at 197-200.  Although McWhite admits that these comments have nothing to do with McLaughlin's race (white), he still believes the comments relate to race because "I was in a position with two white men and one black man;" "I felt that except a white man was in the room with those two, it wouldn't have been said. . . . That's just the respect they got for a black man in my position." Id. "[I]f it was Mr. Turner and Mr. Beverly and a third white man, they would have a little bit more respect for that white man. But I felt that I didn't -- I didn't get the respect as a new manager, a new black manager. I didn't get the respect."  Id.

### 4.     Other Complaints

Darryl Brown, another Plaintiff in this case, complained to Turner  about the racial slurs he was called by Beverly on at least three occasions, in approximately September and November 2010, then again in approximately March 2011.  Brown Dep. 143-45. Brown reported that Beverly was calling him "SAN," "LAN," and "DAN" and detailed for what these acronyms stood[8], but Brown

---

[8]Brown believed "DAN" stood for "dumb ass nigger," "SAN" stood for "stupid ass nigger," and "LAN" stood for "lazy ass nigger."  Brown Dep. 134-36.

felt his complaints "fell on deaf ears."     Brown Dep. 135-36, 139-140.  The first time Brown

complained, Turner said, "That's just Chad."  Brown Dep. 140-41.  Turner did not put a stop to it.

Brown Dep. 139-40.  Brown complained again, approximately two months later, saying that Beverly

was "still doing the same things.  He's calling me a lazy ass nigger, but he's using code words. He's

saying LAN, you know. Can you do something about it?"    Brown Dep. 142.  Turner said "that

would be Chad. I'll talk to him." Brown Dep. 142. Turner did not report Brown's complaints of

racial harassment nor did he put a stop to the harassment.    Brown Dep. 143, 216-17.  Beverly's

behavior did not change.  Id.

McWhite complains that he heard rumors from different non-management employees that

he was going to get fired when he was a trainee in South Carolina, but he cannot remember who

these employees were.  McWhite Dep. 58-59.

McWhite also alleges that he was paid less than Jordy Carter when he was a Management

Trainee. Id. at 180-81. McWhite admits, however, that he was not in the same Management Trainee

class as Jordy Carter, that he does not know the pay of anyone else in his own Management Trainee

class, and that he does not know the pay of anyone else in Jordy Carter's Management Trainee class.

Id. at 181-82.  It is undisputed that the Company increased Management Trainee pay across the board

after McWhite was a Management Trainee.  Webb Decl. ¶ 8.  It is also undisputed that McWhite's

pay was the same as his counterpart Management Trainees within his class, and that Jordy Carter's

pay was the same as the other Management Trainees Carter's class.  Id.

## III.    STANDARD OF REVIEW

The moving party bears the burden of showing that summary judgment is proper.  Summary

judgment is proper if there is no genuine dispute of material fact and the moving party is entitled to

judgment as a matter of law. Fed.R.Civ.P. 56(a); Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).

Summary judgment is proper if the non-moving party fails to establish an essential element of any cause of action upon which the non-moving party has the burden of proof. Celotex, 477 U.S. 317. Once the moving party has brought into question whether there is a genuine dispute for trial on a material element of the non-moving party's claims, the non-moving party bears the burden of coming forward with specific facts which show a genuine dispute for trial. Fed.R.Civ.P. 56(e); Matsushita Electrical Industrial Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574 (1986). The non-moving party must come forward with enough evidence, beyond a mere scintilla, upon which the fact finder could reasonably find for it. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986). The facts and inferences to be drawn therefrom must be viewed in the light most favorable to the non-moving party. Shealy v. Winston, 929 F.2d 1009, 1011 (4th Cir. 1991). However, the non-moving party may not rely on beliefs, conjecture, speculation, or conclusory allegations to defeat a motion for summary judgment. Barber v. Hosp. Corp. of Am., 977 F.2d 874-75 (4th Cir. 1992). The evidence relied on must meet "the substantive evidentiary standard of proof that would apply at a trial on the merits." Mitchell v. Data General Corp., 12 F.3d 1310, 1316 (4th Cir. 1993).

To show that a genuine dispute of material fact exists, a party may not rest upon the mere allegations or denials of his pleadings. See Celotex, 477 U.S. at 324. Rather, the party must present evidence supporting his or her position by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials." Fed.R.Civ.P. 56(c)(1)(A); see also Cray Communications, Inc. v. Novatel Computer Systems, Inc., 33 F.3d 390 (4th Cir. 1994); Orsi v. Kickwood, 999 F.2d 86 (4th Cir. 1993); Local Rules 7.04, 7.05, D.S.C.

-20-

## IV.    DISCUSSION

### A.    Hostile Work Environment

McWhite alleges that he was subjected to a racially hostile work environment in violation of both Title VII and 42 U.S.C. § 1981.  Title VII prohibits an employer from subjecting an employee to a hostile work environment because of the employee's protected class. 42 U.S.C. § 2000e–2(a)(1). Similarly, section 1981 prohibits discrimination based upon race that interferes with a contractual interest.  "At will employment in South Carolina is contractual in nature and may support a claim under Section 1981."  Sellers v. South Carolina Autism Soc., Inc., No. 11–2163, 2012 WL 988064 at * 4 (D.S.C. March 22, 2012).  To survive a motion for summary judgment on a claim of a racially hostile work environment in violation of Title VII or § 1981, a plaintiff must show that there is a genuine issue of material fact as to whether the offending conduct was 1) unwelcome, 2) based upon race, 3) sufficiently severe or pervasive to alter the conditions of his employment and create an abusive work environment, and 4) imputable to his employer.  Ziskie v. Mineta, 547 F.3d 220, 224 (4th Cir.2008).[9]  Defendant argues that McWhite fails to show that the unwelcome conduct was based upon his race, was sufficiently severe and pervasive, or that there is any basis for imputing liability to CSXT.

First, to establish that the alleged conduct was based on race, McWhite must show that, but for his race, he would not have been the victim of the alleged conduct. Gilliam v. S.C. Dep't of Juvenile Justice, 474 F.3d 134, 142 (4th Cir. 2007).  Viewing the evidence in the light most

---

[9]The standards applicable to lawsuits under § 1981 are the same as the standards applicable to lawsuits under Title VII, with the same caselaw being used to evaluate a claim under either statute. See Ross v. Kansas City Power & Light Co., 293 F.3d 1041, 1050 (8th Cir.2002) ("In analyzing a claim ... under section 1981, we apply the same standards as in a similar Title VII claim."); Long v. First Union Corp. of Virginia, 894 F.Supp. 933, 945 (E.D.Va.1995); Kim v. Nash Finch Co., 123 F.3d 1046,1063 (8th Cir.1997).

favorable to McWhite, Beverly made many racially-charged comments to McWhite during his employment: "you thought your black ass got away from me, didn't you," McWhite Dep. at 221, "the black Miss Daisy," Id. at 214, "nigger, get your ass back in here so we can go," Id. at 247-48, "lazy, dumb nigger," Id. at 254, "I got my little black bitch with me," Id. at 216-17, "monkey slave," Id. at 249-50, "token black guy," Id. at 172, and "your black ass belongs to me," Id. at 206.[10]  Citing to same-sex harassment cases, Defendant argues that race-specific comments are not enough to establish a hostile work environment claim.  However, race-related comments are sufficient to establish that the unwelcome conduct was based upon race.  See, e.g., EEOC v. Xerxes Corp., 639 F.3d 658, 671 (4th Cir. 2011) ("Wilson testified that Tammy Smith used racially-tinged names when addressing him. If the facts are as asserted by Pearson and Wilson, they would constitute racial harassment sufficient to alter the conditions of employment and create an abusive atmosphere."). Furthermore, the Fourth Circuit has described the word "nigger" as "an unambiguously racial epithet" and reference to an African-American employee as a "monkey" to be "similarly odious." Spriggs v. Diamond Auto Glass, 242 F.3d 179, 189 (4th Cir. 2001) ("To suggest that a human being's physical appearance is essentially a caricature of a jungle beast . . . is degrading and humiliating in the extreme."); see also White v. BFI Waste Servs., LLC, 375 F.3d 288, 298 (4th Cir. 2004) (holding that use of terms including "boy," "jigaboo," "nigger," "porch monkey," "Mighty Joe Young," and "Zulu warrior" created triable issue of fact on hostile work environment claim).

Also, "the addition of the word 'black' to otherwise race-neutral insults is an indicator that the individual is being targeted because of his race." Tawwaab v. Va. Linen Serv., 729 F. Supp. 2d 757, 775-776 (D. Md. 2010) (collecting cases); Finch v. Smithfield Packing Co., No. 5:99CV10-BR,

---

[10]This is not an exhaustive list of the racial comments made by Beverly.  Other such comments are set forth in the facts section above.

2000 WL 33682696, at *4 (E.D.N.C. Feb. 10, 2000) (holding that "unequivocal examples of racial animus" included instances when plaintiff was instructed to keep his "black ass" off the phone and was called a "black son of a bitch" and a "black motherfucker"); <u>Jenkins v. City of Charlotte</u>, No. 3:03CV44, 2005 WL 1861728, at *3, 11 (W.D.N.C. July 26, 2005) (holding that the use of the phrase "kicking [plaintiff's] black ass" constituted race-based harassment).

Defendant also argues that, in light of Beverly's caustic behavior towards both white and black employees, McWhite cannot show that Beverly's offensive conduct was based upon his race. A similar argument has been rejected by the Fourth Circuit. In <u>Leake v. Ryan's Family Steakhouse</u>, 5 Fed.Appx. 228, 231 (4th Cir. 2001), the district court had granted summary judgment on a hostile work environment claim because the harassing employee mistreated both men and women. The Fourth Circuit held that summary judgment was improper because the plaintiff "forecast sufficient evidence to show that [the harassing employee's] conduct toward <u>him</u> was discriminatory and was motivated by sex." <u>Id.</u> Here, the record reveals that Beverly inflicted offensive behavior on all types of employees, white and black, male and female. However, general mistreatment of other employees does not foreclose upon a hostile work environment claim. <u>Id.</u> Beverly's use of unquestionable racial slurs towards McWhite and supplementing his already offensive comments towards McWhite such as "bitch," "ass," "lazy" and "dumb" with the words "black" or "nigger" are sufficient to show that the offensive conduct he exhibited toward McWhite was based upon his race. Defendant's arguments to the contrary are without merit.

Defendant next argues that the offensive conduct suffered by McWhite was not sufficiently severe or pervasive to alter the conditions of his employment and create an abusive work environment. To show that the conduct was sufficiently severe or pervasive, Plaintiff must establish

that the environment was "both objectively and subjectively offensive, one that a reasonable person would find hostile or abusive, and one that the victim in fact did perceive to be so." Faragher v. City of Boca Raton, 524 U.S. 775, 787, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998) (citing Harris v. Forklift Sys., Inc., 510 U.S. 17, 21–22, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993)). Actionable harassment occurs when the workplace is "permeated with discriminatory intimidation, ridicule, and insult." Harris, 510 U.S. at 21.

Importantly, "conduct that is either pervasive or severe may give rise to a hostile work environment[;] ... even one act of harassment will suffice if it is egregious." Whitten v. Fred's, Inc., 601 F.3d 231, 243 (4th Cir.2010), overruled on other grounds (quoting Cerros v. Steel Techs., Inc., 398 F.3d 944, 950 (7th Cir.2005)) (emphasis added); see also Faragher v. City of Boca Raton, 524 U.S. 775, 788, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998) (noting that, while isolated incidents generally do not show an objectively hostile work environment, if a single incident is "extremely serious," it may be sufficient to state a claim).

However, Title VII is not a "general civility code." Oncale v. Sundowner Offshore Services, Inc., 523 U.S. 75, 80, 118 S.Ct. 998, 140 L.Ed.2d 201 (1998). "Workplaces are not always harmonious locales, and even incidents that would objectively give rise to bruised or wounded feelings will not on that account satisfy the severe and pervasive standard." EEOC v. Sunbelt Rentals, Inc., 521 F.3d 306, 315 (4th Cir.2008).

The Fourth Circuit has established a four factor approach to evaluate the totality of the circumstances in determining whether conduct is severe or pervasive: (1) the frequency of the discriminatory conduct; (2) its severity; (3) whether it was physically threatening or humiliating, or a mere offensive utterance; and (4) whether the conduct unreasonably interfered with plaintiff's work

-24-

performance. <u>Connor v. Schrader Bridgeport Int'l, Inc.</u>, 227 F.3d 179, 193 (4th Cir.2000). In the record, McWhite provides at least fourteen specific examples of racial comments[11] made to him by Beverly between 2009 and 2011, and a few of those examples occurred on several occasions.[12] There is no bright line test for the "number of times a supervisor or employer can use a racial slur while addressing an employee without creating a hostile work environment for Title VII purposes." <u>Hampton v. J.W. Squire Co.</u>, No. 4:10cv13, 2010 WL 3927740, at *3 (W.D.Va. Oct. 5, 2010). However, at least one court in this circuit has found a similar number of racial comments during a similar time period to be sufficient to at least create an issue of fact on the pervasiveness of the offensive conduct. <u>See</u>, <u>e.g.</u>, <u>Tawwaab v. Virginia Linen Service, Inc.</u>, 729 F.Supp.2d 757, 778 (D.Md. 2010) (holding ten actionable incidents of harassment during a two year period sufficient to create an issue of fact).

Furthermore, as is often quoted by courts within the Fourth Circuit, "far more than a 'mere offensive utterance,' the word 'nigger' is pure anathema to African-Americans. 'Perhaps no single act can more quickly alter the conditions of employment and create an abusive working environment than the use of an unambiguously racial epithet such as 'nigger' . . . .'" <u>Spriggs</u>, 242 F.3d at 185 (citing <u>Rodgers v. Western-Southern Life Ins. Co.</u>, 12 F.3d 668, 675 (7th Cir.1993)). Likewise,

---

[11]As set forth in the facts above, these examples include "thought your black ass got away from me," "black Miss Daisy," "stealing" is "what you all used to anyway," "nigger, get your black ass in here so we can go" "little black bitch," "monkey slave," "lazy, dumb nigger," "token black guy," "token" like Obama, we have to keep "at least 3 blacks at all times to keep Jessie Jackson and Al Sharpton off our asses," "your black ass belongs to me," "that's what all the brothers do in the hood," Brown looks like "a lazy nigger," and Brown's skin is so dark because he was from "some tribe in Africa."

[12]McWhite testifies that Beverly called him the "black Miss Daisy" approximately 15 times and "nigger" on several occasions.

Beverly's reference to McWhite as a "monkey slave" is also deplorable: "[t]o suggest that a human being's physical appearance is essentially a caricature of a jungle beast goes far beyond the merely unflattering; it is degrading and humiliating in the extreme." Id. (citing Walker v. Thompson, 214 F.3d 615, 626 (5th Cir.2000) (triable issue raised with regard to hostile work environment where, inter alia, supervisors verbally assailed African American employees with physically humiliating comparisons to "monkeys" and "slaves")).

Finally, despite Defendant's argument to the contrary, McWhite has presented evidence that Beverly's conduct interfered with his work. Specifically, McWhite testifies that he bid on a job away from Beverly's section of track in an attempt to avoid working with him because he was difficult to work for. McWhite Dep. 190.

"[W]hether harassment was sufficiently severe or pervasive to create a hostile work environment is 'quintessentially a question of fact' for the jury." Conner v. Schrader-Bridgeport Int'l, Inc., 227 F.3d 179, 199-200 (4th Cir. 2000) (quoting Smith v. First Union Nat'l Bank, 202 F.3d 234, 243 (4th Cir. 2000)). Here, McWhite has presented sufficient evidence to create an issue of fact as to whether the conduct about which he complains was sufficiently severe or pervasive to create a hostile work environment.

The final prong necessary to establish a hostile work environment claim is to show that the harassing conduct is imputable to the employer. Harassing conduct is automatically imputable to the employer if the offending individual is the plaintiff's supervisor. Faragher, 524 U.S. at 807; Ellerth, 524 U.S. at 765. Recently, in Vance v. Ball State University, the Supreme Court recognized that Ellerth and Faragher left open the issue of who qualifies as a supervisor for vicarious liability purposes under Title VII. Vance, 2013 WL 3155228, * 3. The Court in Vance addressed the split

in circuit authority as to whether supervisor status requires "the power to hire, fire, demote, promote, transfer, or discipline the victim" or whether such status is tied to "the ability to exercise significant direction over another's daily work." Id. at *7 (citations omitted). The Vance Court held that

> an employer may be vicariously liable for an employee's unlawful harassment only when the employer has empowered that employee to take tangible employment actions against the victim, i.e., to effect a "significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits."

Id. (citations omitted). The Court rejected the opposing "nebulous definition" of supervisor, which would provide supervisory status to employees who "have the ability to direct a co-worker's labor to some ill-defined degree," as adopted by several courts of appeal, including the Fourth Circuit in Whitten v. Fred's, Inc., 601 F.3d 231, 245–247 (4th Cir. 2010). Id.

Here, the evidence reveals that, although Beverly was responsible for the section of track upon which McWhite worked when he was a union employee, Beverly had no real supervisory authority over McWhite because he had no authority to fire, discipline, or change the pay of McWhite. Beverly Dep. 62, 65, 81, 151, 184. In addition, Roadmasters like Beverly have no authority to accept bids or award jobs to employees. Moore Dep. 127-28. Also, while McWhite was in the Management Training Program, Beverly provided him with on the job training but did not evaluate him or assess him nor did he have any disciplinary authority over him. Webb. Decl. ¶ 3.

McWhite argues that "Beverly was clearly Plaintiff's supervisor under the standards elucidated in the Fourth Circuit," citing specifically to Whitten v. Fred's, Inc., 601 F.3d 231, 245–247 (4th Cir. 2010). McWhite Response p. 24. However, as set forth above, after McWhite filed his Response in this case, the holding in Whitten was overruled by the Supreme Court.

Because Beverly was not Plaintiff's supervisor, his harassing conduct is imputable to CSXT only if CSXT "was negligent in failing, after actual or constructive knowledge, to take prompt and adequate action to stop it." <u>Howard v. Winter</u>, 446 F.3d 559, 567 (4th Cir. 2006).[13]  An employer "cannot avoid Title VII liability for coworker harassment by adopting a 'see no evil, hear no evil' strategy. Knowledge of harassment can be imputed to an employer if a reasonable person, intent on complying with Title VII, would have known about the harassment." <u>Ocheltree v. Scollon Prod., Inc.</u>, 335 F.3d 325, 334 (4th Cir.2003).  In this vein, an employer "may be charged with constructive knowledge of coworker harassment when it fails to provide reasonable procedures for victims to register complaints." <u>Id.</u>  However, "[t]he law against harassment is not self-enforcing and an employer cannot be expected to correct harassment unless the employee makes a concerted effort to inform the employer that a problem exists." <u>Barrett v. Applied Radiant Energy Corp.</u>, 240 F.3d 262, 268 (4th Cir.2001).  Ultimately, courts "must determine when [CSXT] had actual or constructive notice of [Beverly's] alleged harassing behavior and whether the [CSXT's] response was reasonable once such notice was provided." <u>Howard</u>, 446 F.3d at 567.

---

[13]McWhite and, to some extent, Defendant, after addressing whether Beverly qualifies as McWhite's supervisor for the purpose of automatically imputing liability to CSXT, moves on to a discussion of the <u>Ellerth/Faragher</u> affirmative defense, which a defendant may utilize when the harassing individual is a supervisor.  <u>Spriggs</u>, 242 F3d at 186. However, because Beverly was not McWhite's supervisor, it is unnecessary to address the <u>Ellerth/Faragher</u> affirmative defense.  <u>See Bland v. Fairfax County, Va.</u>, 2011 WL 3421568 n.4 (E.D.Va. Aug. 3, 2011) (noting that the <u>Ellerth/Faragher</u> defense is inapplicable to cases of coworker harassment).  Liability can still be imputed to CSXT if, as set forth above, it was negligent in failing, after actual or constructive knowledge, to take prompt and adequate action to stop Beverly's harassing conduct.  Although the elements required to establish the <u>Ellerth/Farragher</u> defense are similar to those required to impute liability for a co-worker's harassment, the burden of proof is not.  Imputing liability to the employer for a co-worker's harassment is an element required for a hostile work environment claim and, thus, the burden remains with Plaintiff to present sufficient evidence to create a dispute of fact on this issue.

Here, the record reveals that Brown put one of the supervisors, Turner, on notice of Beverly's racially harassing conduct on three occasions, in approximately September and November 2010, then again in approximately March 2011.  Brown Dep. 143-45.  Brown reported that Beverly was calling him "SAN," "LAN," and "DAN" and detailed for what these acronyms stood.  Brown Dep. 135-36, 139-140.  The first time Brown complained, Turner said, "That's just Chad."  Brown Dep. 140-41.  Turner did not put a stop to it.  Brown Dep. 139-40.  Brown complained again, approximately two months later, saying that Beverly was "still doing the same things.  He's calling me a lazy ass nigger, but he's using code words.  He's saying LAN, you know.  Can you do something about it?"  Brown Dep. 142.  Turner said "that would be Chad.  I'll talk to him."  Brown Dep. 142.  Turner did not report Brown's complaints of racial harassment nor did he put a stop to the harassment.   Brown Dep. 143, 216-17.  Beverly's behavior did not change.  Id.  Around this same time, Turner himself, with knowledge that Beverly was engaging in racially harassing conduct towards at least one employee, participated in racially offensive conduct in McWhite's presence.  Specifically, Turner asked McWhite why Darryl Brown's skin was darker than his and whether Darryl was from Africa.  McWhite Dep. 193.  Beverly was present and responded that Darryl was from "some tribe in Africa."  Id. at 195.

This evidence of notice is weak.  However, considering Brown's three complaints to Turner about Beverly's racial harassment, Turner's participation with Beverly is at least one racially offensive conversation in McWhite's presence, the numerous racially offensive comments made by Beverly, and Beverly's insinuations that he and Turner (and other supervisors) were close, McWhite presents just enough evidence to cross the scintilla of evidence threshold and create an issue of fact

as to whether Defendant was on notice of the racial harassment towards McWhite.[14]

Once the employer has notice, it must "take prompt and adequate action to stop it." Howard, 446 F.3d at 567. It is undisputed that no action was taken by Turner in response to Brown's complaints regarding Beverly's conduct. Although an investigation was eventually made into the complaints raised by McWhite to the Ethics Hotline, that investigation did not begin until August 16, 2011. Brown began making complaints to Turner in September of 2010. Therefore, McWhite presents sufficient evidence to create an issue of fact as to whether Defendant was negligent in failing to take prompt and adequate action to stop the harassment. Accordingly, summary judgment is not appropriate on McWhite's claim of a hostile work environment as created by Beverly.

## B.    Retaliation

McWhite argues that Beverly retaliated against him for making the complaint to the Ethics Hotline by sending him to inspect railway yards in Georgetown, which is over two hours from where he normally worked and refusing to mentor him as a part of the management training program. Title VII makes it an "unlawful employment practice for an employer to discriminate against any of his

---

[14]In addition to Brown's complaints to Turner, it is undisputed that McWhite made a complaint to the Ethics Hotline regarding Beverly's behavior. The notes documenting McWhite's original call to the Ethics Hotline indicate that McWhite was complaining of verbal and physical harassment. Call Center Records (Ex. F to McWhite Response). The written complaint submitted by McWhite following his call makes no mention of any harassment based upon race. See McWhite Dep. Ex. 16. Thereafter, EEO Manager Shauna Watson conducted an investigation in to the allegations raised by McWhite. During his interview with Watson, McWhite told her that other employees told him to indicate that Beverly was discriminating against him because of his race. McWhite Interview. When Watson asked, "Do you feel that was the reason?" McWhite stated "there were other employees and he just singled me out. He threatened me in form [sic] of R.J. Allison. He said I and [sic] the roadmaster here and me and DE are real tight and would get me disqualified." Id. In addition, when asked by Watson, "do you think it [instructing other employees not to speak to him after he bid off Beverly's section] was he lost a good employee and was upset or was it race?" McWhite answered, "I think a little bit of both." Id.

employees ... because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter." 42 U.S.C. § 2000e-3(a).

To establish a prima facie case of retaliation under Title VII, a plaintiff must show (1) he engaged in protected activity, (2) the employer took adverse employment action against him, and (3) a causal connection existed between the protected activity and the adverse action. Ross v. Communications Satellite Corp., 759 F.2d 355, 365 (4th Cir.1985); Laughlin v. Metropolitan Washington Airports Authority, 149 F.3d 253, 258 (4th Cir.1998); Causey v. Balog, 162 F.3d 795, 803 (4th Cir.1998). If Plaintiff establishes a prima facie case, Defendant can rebut the presumption of retaliation by articulating a non-retaliatory reason for its actions. At that point, Plaintiff has the opportunity to prove that Defendant's legitimate, non-retaliatory reason is pretextual. See Matvia v. Bald Head Island Management, 259 F.3d 261, 271 (4th Cir.2001).

CSXT assumes for purposes of this motion that McWhite engaged in protected activity when he made his complaint to the Ethics Hotline. However, it argues that McWhite did not suffer any adverse employment action nor is there a causal connection between the employment actions alleged by McWhite and his protected activity. The Supreme Court has clarified that a different and less strenuous standard is used to define adverse employment actions in the retaliation context as opposed to other Title VII contexts: "[T]he anti-retaliation provision, unlike the substantive provision, is not limited to discriminatory actions that affect the terms and conditions of employment." Burlington Northern & Santa Fe Rwy. v. White, 548 U.S. 53, 64, 126 S.Ct. 2405, 165 L.Ed.2d 345 (2006). However, the anti-retaliation provision "protects an individual not from all retaliation, but from retaliation that produces an injury or harm." Id. at 67. Thus, "a plaintiff must show that a reasonable

-31-

employee would have found the challenged action materially adverse, which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." Id. at 68 (quotation marks and citations omitted).  Defendant argues that it is not unusual for any employee to be sent to work somewhere within his or her usual station.  Beverly Dep. 148-49.  For instance, in response to the question, "So there could be situations where an assistant roadmaster or a roadmaster would be told to do work two or three hours from his work station all the time and that would be normal?" Turner responded, "Absolutely.  As I said earlier, I was roadmaster assistant in Florence, and I worked in Florence two or three weeks the whole time." Turner Dep. 32-33, 102.  Beverly also testified that, even though he was at one time an assistant roadmaster for the Florence territory, he rarely spent time there because assistant roadmasters are moved around frequently.  Beverly Dep. 69-70, McWhite himself admitted that it was not unusual for employees to travel within their territory for a particular assignment.  McWhite Dep. 176-77;

Even if McWhite's assignment to work in Georgetown is sufficient to qualify as a materially adverse action, McWhite fails to show a causal connection between his protected activity and the Georgetown assignment.  Defendant argues that any assignments by Beverly for McWhite to work in Georgetown occurred before McWhite made his complaint to the Ethics Hotline.  In his deposition, McWhite testifies that the last time he worked with Beverly was approximately July of 2011, which was before he made the Ethics Hotline complaint on August 12, 2011.  A plaintiff cannot establish a causal connection where the alleged retaliatory conduct precedes the protected activity. See Keeshan v. Eau Claire Coop. Health Ctrs., Inc., 394 F. App'x 987, 995 (4th Cir. 2010) (affirming finding that the causal connection element was not satisfied because the plaintiffs' problems at the company started long before she filed her discrimination complaint); Hindman v.

Greenville Hosp. Sys., 947 F. Supp. 215, 224 (D.S.C. 1996) ("the requisite causal connection for retaliation claims can be established only if the protected activity preceded the alleged retaliatory conduct"), aff'd, 133 F.3d 915 (4th Cir. 1997).  McWhite points to his EEOC Affidavit, in which he states that "[a]s a result of my filing of the grievance with the Ethics Department and in an effort to keep me out of the view of any people of significance at CSXT, Beverly has been sending me to inspect railway yards in Georgetown, South Carolina, which is over two (2) hours away from where I normally work."  McWhite EEOC Affidavit.

Nevertheless, as stated above, it was not uncommon for employees to work several hours from their usual duty station.  To meet the causal connection requirement, a plaintiff must show that the adverse action would not have occurred "but for" the protected conduct. Ross v. Communications Satellite Corp., 759 F.2d 355, 365-66 (4th Cir.1985) overruled on other grounds by Price Waterhouse v. Hopkins, 490 U.S. 228 (1989). "A causal relationship [between protected activity and adverse action] requires more than simple coincidence. Causation requires the employer's action be the consequence of the protected activities and of nothing else." Bray v. Tenax Corp., 905 F. Supp. 324, 328 (E.D.N.C. 1995).  McWhite fails to present sufficient evidence to show that he would not have been assigned to work in Georgetown but for his report to the Ethics Hotline. As such, summary judgment is appropriate on McWhite's retaliation claim.

**V.    CONCLUSION**

For the reasons discussed above, it is recommended that Defendant's Motion for Summary Judgment as to Plaintiff Earnest McWhite's claims (Document # 86) be denied as to his claim of hostile work environment and granted as to his retaliation claim.


       s/Thomas E. Rogers, III
Thomas E. Rogers, III
United States Magistrate Judge

August 21, 2013
Florence, South Carolina